**CEMENTOS ANAHUAC DEL GOLFO, S.A., Plaintiff,**

**and**

**Cementos de Chihuahua, S.A., Cementos Guadalajara, S.A. de C.V., Cementos Mexicanos, S.A. de C.V., Cementos Portland Nacional, S.A. de C.V. and Cementos Veracruz, S.A. de C.V., Intervenor–Plaintiffs,**

**v.**

**UNITED STATES, and Malcolm Baldrige, Secretary of Commerce, Defendants,**

**and**

**Gifford Hill & Company, Inc. and Kaiser Cement Corporation, Intervenor–Defendants.**

**Court No. 86–01–00082.**

United States Court of International Trade.

May 12, 1988.

C.V., Cementos Mexicanos, S.A. de C.V., Cementos Portland Nacional, S.A. de C.V. and Cementos Veracruz, S.A. de C.V.

John R. Bolton, Asst. Atty. Gen.; David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice J. Kevin Horgan; and Office of the Deputy Chief Counsel for Import Adm'n, U.S. Dept. of Commerce, Craig L. Jackson, Washington, D.C., for defendants.

Squire, Sanders & Dempsey, Ritchie T. Thomas, William D. Kramer and William A. Henry, Washington, D.C., for intervenor-defendants.

## OPINION AND ORDER

AQUILINO, Judge:

This case seeks revocation of an order of the International Trade Administration, U.S. Department of Commerce *sub nom. Final Affirmative Countervailing Duty Determination and Countervailing Duty Order; Portland Hydraulic Cement and Cement Clinker From Mexico*, 48 Fed. Reg. 43,063 (Sept. 21, 1983), in the aftermath of the agency's first administrative review thereunder.

### Background

The history of that determination, wherein the International Trade Administration ("ITA") concluded that "certain benefits which constitute bounties or grants within the meaning of section 303 of the Tariff Act of 1930 ... are being provided to manufacturers, producers, or exporters in Mexico of portland hydraulic cement and cement clinker" [1], is set forth in the thorough opinion in *Cementos Guadalajara, S.A. v. United States*, 12 CIT ——, 686 F.Supp. 335 (1988), *appeal filed* May 4, 1988, and will not be repeated here.

Pursuant to 19 U.S.C. § 1675, the ITA conducted the first review of its countervailing-duty ("CVD") order for the period July 1 through December 31, 1983. However, prior to publication of either the re-

Rogers & Wells, Eugene T. Rossides and Robert E. Ruggeri, Washington, D.C., for plaintiff.

Willkie Farr & Gallagher, Walter J. Spak, Jeffrey W. Carr and Robert A. Peterson, Washington, D.C., for intervenor-plaintiff Cementos de Chihuahua, S.A.

O'Connor & Hannan, Andrew Jaxa–Debicki, Washington, D.C., for intervenor-plaintiffs Cementos Guadalajara, S.A. de

1.  48 Fed.Reg. at 43,063–64.

view's preliminary[2] or final[3] results, an "Understanding between the United States and Mexico Regarding Subsidies and Countervailing Duties" had been reached (on April 23, 1985).[4] It provides, in part, as follows:

5. INJURY TEST

For purposes of the application of countervailing measures, there shall be no presumption that incentives granted by the Government of the United Mexican States result in adverse effects to the trade or production of the United States. Such adverse effects shall be demonstrated by positive evidence, through formal investigation procedures prescribed by applicable U.S. domestic law for determining the economic impact of Mexican imports upon an industry in the United States. With respect to all United States countervailing duty investigations in progress concerning products of Mexico as of the date of entry into force of this Understanding, the United States shall ensure that no countervailing duties shall be imposed upon any product of Mexico unless it is determined that the subsidized imports are, through the effects of the subsidy, causing or threatening to cause material injury to an established domestic industry, or retard materially the establishment of a domestic industry.

\*    \*    \*    \*    \*    \*

14. On the basis of this Understanding, Mexico shall be designated as a "country under the Agreement" as provided by section 701 of the Tariff Act of 1930, as amended by the Trade Agreements Act of 1979 effective on the date of publication of such designation in the *Federal Register*.

The date of publication of Mexico's designation as a "country under the Agreement" within the meaning of section 701, 19 U.S. C. § 1671, was April 30, 1985. *See* 50 Fed.Reg. 18,335.

The final results of the ITA's review revealed a "country-wide" bounty or grant rate of 3.50 percent *ad valorem,* but Comment 8 on the results was to the effect that the ITA should revoke its CVD order on the ground that the

Understanding creates an international obligation on the United States to apply the same procedures in countervailing duty proceedings on Mexican products as for products from other countries. Since section 303 prohibits the Department from assessing countervailing duties on duty-free products from other countries, absent an injury test, Mexico is entitled to the same procedural treatment. 50 Fed.Reg. at 51,736.

The ITA responded that it

has no international obligation within the meaning of section 303 of the Tariff Act to provide an injury test in this case. The Understanding specifically limits injury tests in countervailing duty proceedings to investigations in progress on April 23, 1985 and to proceedings begun on or after that date. *Id.*

It is this response which is at the core of plaintiff's complaint and present motion for judgment on the agency record pursuant to CIT Rule 56.1. The relief sought in the motion is a direction to the ITA to revoke its CVD order and to

take the necessary steps to ensure that, in accordance with … revocation …, all remaining unliquidated entries of the relevant merchandise subject to the Order and the annual administrative review are liquidated without the assessment of countervailing duties.[5]

A brief submitted on behalf of intervenor-plaintiff Cementos de Chihuahua, S.A. joins with the plaintiff in seeking revocation.[6]

Jurisdiction over this case is predicated on 28 U.S.C. § 1581(c). The court has enjoined, without opposition, the liquidation

---

**2.** *See* 50 Fed.Reg. 27,476 (July 3, 1985).

**3.** *See* 50 Fed.Reg. 51,732 (Dec. 19, 1985).

**4.** A copy is in the record as document ("R.Doc.") 39.

**5.** Plaintiff's proposed form of order, p. 2.

**6.** Other issues raised in plaintiff's motion, as well as in the papers of intervenor-plaintiff Cementos de Chihuahua, S.A. and the other intervenor-plaintiffs, are discussed *infra,* pages 1566–69.

of cement entries during the period of the administrative review, pending resolution of the issues raised herein.

### Discussion

Of course, the overriding concern this case touches upon is continuation and enhancement of long-standing, friendly relations between the United States of America and of Mexico. To this end, representatives of the respective governments entered into the Understanding, interpretations of which are now offered by parties not responsible for its adoption. Be this as it may, the court concludes that the first analysis should be at the domestic, administrative level rather than on the international plane.

### I

The actions challenged herein are those of the ITA, which is governed by the Tariff Act of 1930. That law has been amended by the Trade Agreements Act of 1979, Pub. L. No. 96–39, 93 Stat. 144 (and by the Trade and Tariff Act of 1984, Pub.L. No. 98–573, 98 Stat. 2948), which added the following section 701, 19 U.S.C. § 1671, covering imposition of countervailing duties:

(a) General rule

If—

(1) the administering authority determines that—

(A) a country under the Agreement, or

(B) a person who is a citizen or national of such a country, or a corporation, association, or other organization organized in such a country,

is providing, directly or indirectly, a subsidy with respect to the manufacture, production, or exportation of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States, and

(2) the Commission determines that—

(A) an industry in the United States—

(i) is materially injured, or

(ii) is threatened with material injury, or

(B) the establishment of an industry in the United States is materially retarded,

by reason of imports of that merchandise or by reason of sales (or the likelihood of sales) of that merchandise for importation,

then there shall be imposed upon such merchandise a countervailing duty, in addition to any other duty imposed, equal to the amount of the net subsidy....

Subsection (b) defines the term "country under the Agreement" to mean a country

(1) between the United States and which the Agreement on Subsidies and Countervailing Measures applies, as determined under section 2503(b) of this title,

(2) which has assumed obligations with respect to the United States which are substantially equivalent to obligations under the Agreement, as determined by the President, or

(3) with respect to which the President determines that—

(A) there is an agreement in effect between the United States and that country which—

(i) was in force on June 19, 1979, and

(ii) requires unconditional most-favored-nation treatment with respect to articles imported into the United States,

(B) the General Agreement on Tariffs and Trade does not apply between the United States and that country, and

(C) the agreement described in subparagraph (A) does not expressly permit—

(i) actions required or permitted by the General Agreement on Tariffs and Trade, or required by the Congress, or

(ii) nondiscriminatory prohibitions or restrictions on importation which are designed to prevent deceptive or unfair practices.

Here, the record shows that the merchandise involved, namely, Portland hydraulic cement and cement clinker other

than white, nonstaining, was subject to importation free of duty under TSUS items 511.1420 and 511.1440. *See, e.g.,* 48 Fed. Reg. at 43, 064. The record also shows that Mexico was not a "country under the Agreement" in 1983, having first attained such status in 1985 as per the following pronouncement of the United States Trade Representative:

> The Government of the United Mexican States has assumed obligations with respect to the United States which are substantially equivalent to obligations under the Agreement on the Interpretation and Application of Articles VI, XVI and XXIII of the General Agreement on Tariffs and Trade.
>
> In accordance with section 701(b) of the Tariff Act of 1930, as amended (19 U.S.C. 1671(b)), as of April 23, 1985, Mexico is a "country under the Agreement." [7]

■ If a country is not one under the Agreement, subsection (d) of section 701 cross-references section 303 of the 1930 act, as amended, 19 U.S.C. § 1303, as to the levy of countervailing duties.[8] However, once a country meets the standard(s) set forth in section 701(b), then section 701(a) governs domestic, administrative imposition of any countervailing duty.[9] Under section 701(a), such imposition occurs only upon both an ITA determination of the existence of a countervailable subsidy and an International Trade Commission ("ITC") determination of material injury by reason of imports benefitting from such subsidy. This law is clear, and the court is compelled to follow its plain meaning. *See, e.g., Trans Alaska Pipeline Rate Cases,* 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed. 2d 591 (1978).

■ Here, Mexico met the standard(s) of section 701(b) before any countervailing duties were sought to be imposed on entries for the period at issue, July 1—December 31, 1983. The change in its status, as the country of origin, altered the status of the merchandise emanating therefrom insofar as imposition of those duties was concerned.

The defendants argue at page 18 of their memorandum that section 701 is "of no avail with respect to countervailing duty orders which predated the Understanding", *i.e.,* which predate Mexico's change in status to a country under the Agreement. By their reasoning, that change since publication of the original CVD order has no impact on the procedure for imposing duties as a result of their administrative review, yet section 701 was enacted for the purpose of distinguishing treatment of countries' products on exactly that basis. *See, e.g.,* S.Rep. 249 at 38, U.S.Code Cong. & Admin. News 1979, p. 424 ("The most conspicuous change in current law ... is the introduction of a material injury test before any countervailing duty may be imposed on products of countries which assume the obligations of the agreement relating to subsidies and countervailing measures"). Moreover, the court notes in passing that defendants' position contradicts the one taken in defense of the ITA's calculation of the specific rates to be imposed. On that matter, the agency chose not to adhere to the methodology used in its original order in view of changed facts and circumstances. *See* pages 1567–68 *infra.* Counsel assert:

> Since the facts relevant to the ITA's determination ... changed dramatically in the administrative review as compared to the original investigation, it is beyond dispute that the ITA would not have been bound in the administrative review by its determination ... in the original investigation, even if there had been no intervening change in the countervailing duty law. Defendants' Memorandum, pp. 23–24.

---

7. 50 Fed.Reg. 18,335–36 (April 30, 1985).

8. This provision was apparently the focus of *Cementos Guadalajara, S.A. v. United States. See* 12 CIT at ——, 686 F.Supp. at 347.

9. *See* S.Rep. No. 249, 96th Cong., 1st Sess. [cited hereinafter as "S.Rep. 249"], pp. 43–44 (1979),

U.S.Code Cong. & Admin.News 1979, pp. 381, 429–430 (Section 701 applies to merchandise from countries "to which the United States accords the benefits of the Agreement", while section "303 would apply to all imports other than those to which new section 701 ... applies").

If this is true, then Mexico's official designation as a country under the Agreement certainly qualifies as such a change—one sufficient to unbind the ITA from the original parameters of its CVD order.

This does not mean, however, that the date of entry of merchandise subject to the order is of no consequence. On the contrary, that moment determines what, if any, tariff applies and also whether a countervailing duty can be assessed. As the Court of Customs & Patent Appeals put it many years ago in adopting the government's position, "the liability for countervailing duty attached, at the time of importation, by reason of the [Secretary of Treasury's] declaration of the factum of the bounty antedating the importation".[10] But liability for such an impost is distinct from the mechanism (and timing) of its assessment. *See, e.g., Ambassador Division of Florsheim Shoe v. United States,* 748 F.2d 1560, 1565 (Fed.Cir.1984) ("the duty to be assessed can only be the duty incurred in the past period covered by the review"). While the prescribed tariff is determined at the date of entry, the same cannot be said with regard to the rate of any additional, countervailing duty. Indeed, determination of the presence of a bounty and of particularized benefit therefrom post-dates the moment of entry, and that administrative process is governed by the law existent then. To repeat, during the course of the *ex post facto* analysis of the entries herein, Mexico's status changed in such a way as to require a different administrative approach—in accordance with the applicable law of the United States.

The defendants and intervenor-defendants refer to the Trade Agreements Act's transition rules for CVD orders, § 104, 93 Stat. at 190–93, which provided for injury determinations upon request for those orders that were in effect on January 1, 1980 (or which were subsequently issued pursuant to a court action commenced prior to

that date). Thus, they infer that since there are no specific provisions for an injury test for later orders like the one at issue here, no right to a test exists. However, the statute itself refutes that inference. Section 303(a), as amended by section 103(a) of the 1979 act, contemplates such orders by excluding from its coverage goods which are the product of a country under the Agreement. *See* S.Rep. 249 at 103, U.S.Code Cong. & Admin.News 1979, p. 489. As set forth above, those goods are covered under section 701, which does provide for an injury test.

**II**

Section 303 of the Tariff Act of 1930 had been amended by the Trade Act of 1974, § 331, 88 Stat. 1978, 2049, to cover duty-free merchandise as follows:

In the case of any imported article or merchandise which is free of duty, duties may be imposed under this section only if there are affirmative determinations by the Commission under subtitle IV of this chapter; except that such a determination shall not be required unless a determination of injury is required by the international obligations of the United States. 19 U.S.C. § 1303(a)(2).

The ITA's interpretation of this provision, as quoted (*supra* page 1560) from its December 1985 determination, is that, although the cement herein is duty-free, no international obligation required an injury test. That is, the

Understanding specifically limits injury tests in countervailing duty proceedings to investigations in progress on April 23, 1985. . . . 50 Fed.Reg. at 51,736.

Defendants' counsel now add that Mexico did not join the General Agreement on Tariffs and Trade[11] until August 24, 1986, or after the administrative review herein, and therefore that

its status as a "country under the agreement" is limited by the explicit terms of

---

**10.** *V. Mueller & Co. v. United States,* 115 F.2d 354, 361 (CCPA 1940). *Cf. Zenith Radio Corporation v. United States,* 1 CIT 180, 184, 509 F.Supp. 1282, 1286 (1981) ("it is axiomatic that a claim by the United States for the appropriate duties arises upon the entry of a shipment of

merchandise into the customs territory of the United States").

**11.** Oct. 30, 1947, 61 Stat., T.I.A.S. No. 1700, 50 U.N.T.S. 184.

the Understanding. By virtue of the Understanding, Mexico became a country under the agreement only with respect to "investigations in progress." [12]

In counsel's view, the meaning of the word "investigations" is the controlling question herein. The defendants contend that, since the executive branch of the government negotiated the Understanding, its regulations are "clearly the best evidence" [13] of what that meaning is, "notwithstanding how that term has been used by Congress or interpreted by the courts." [14] In fact, ITA regulations regarding countervailing duties define an "investigation" to refer

> to that time between the publication of a notice of initiation and the publication of the earliest of (1) a notice of termination, (2) a negative determination that has the effect of terminating the administrative proceedings; or (3) an Order. [15]

On its face, this is the definition of a period of time and not of that which transpires then. Indeed, the plaintiff has sought to show that many of the steps taken during that period are repeated thereafter in conjunction with an administrative review pursuant to 19 U.S.C. § 1675. [16] Dictionaries do not define investigation in terms of time, but rather as the "[a]ct of investigating; process of inquiring into or tracking down; thorough inquiry; research." Webster's New International Dictionary of the English Language, p. 1306 (2d ed. 1945). *See* Funk & Wagnalls Standard Dictionary of the English Language, p. 669 (Int'l ed. 1963); Webster's Third New International Dictionary of the English Language, p. 1189 (1981). *See also* Black's Law Dictionary, p. 740 (5th ed. 1979).

As for interpretations in court or Congress, the executive version of the meaning of investigation was at issue in *Al Tech*

*Specialty Steel Corp. v. United States*, 745 F.2d 632 (Fed.Cir.1984), which arose out of an administrative review of an anti-dumping-duty order. The Trade Agreements Act had added a requirement to the Tariff Act of 1930 that the ITA "verify all information relied upon in making a final determination in an investigation." 19 U.S. C. § 1677e(a). As here, the agency sought to restrict investigation to the time of its original less-than-fair-value inquiry, but the court of appeals affirmed the Court of International Trade's overruling of such a reading: the ITA's interpretation is " 'plainly inconsistent with the statute,' and contrary to 'the clear meaning' of the statute, 'as revealed by its language, purpose and history.' " 745 F.2d at 642, quoting *Southeastern Community College v. Davis*, 442 U.S. 397, 411, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979) (quoting *Teamsters v. Daniel*, 439 U.S. 551, 566 n. 20, 99 S.Ct. 790, 800 n. 20, 58 L.Ed.2d 808 (1979)). Congress confirmed the *Al Tech* outcome in the Trade and Tariff Act of 1984, § 618, 98 Stat. at 3037–38, albeit not by defining investigation any further.

Notwithstanding the outcome in *Al Tech*, there is discussion to the effect that the statute is "ambiguous in its use of the pertinent terms" and there is "some uncertainty arising from the statute over the meanings of the terms 'investigation', 'proceeding', and 'final determination.' " 745 F.2d at 636. When this is true, the Supreme Court has set forth "a general principle of construction with respect to treaties", to wit,

> that they shall be liberally construed, so as to carry out the apparent intention of the parties to secure equality and reciprocity between them. As they are contracts between independent nations, in their construction words are to be taken

---

**12.** Defendants' Memorandum of Points and Authorities, p. 21.

**13.** *Id.* at 12.

**14.** *Id.* at 13.

**15.** 19 C.F.R. § 355.6(b). *See also* 19 C.F.R. § 353.11(b) (covering antidumping proceedings).

**16.** *See, e.g.,* P.B. Feller, 1 U.S. Customs and International Trade Guide § 17.03 at pp. 17–15 to 17–16 (1987) ("The annual review ... replicates in substance the initial subsidies investigation"). *See generally* E.T. Rossides, U.S. Import Trade Regulation, pp. 254–79 (1986).

in their ordinary meaning, as understood in the public law of nations, and not in any artifical or special sense impressed upon them by local law, unless such restricted sense is clearly intended. And it has been held by this court that where a treaty admits of two constructions, one restrictive of rights that may be claimed under it and the other favorable to them, the latter is to be preferred.

*De Geofroy v. Riggs,* 133 U.S. 258, 271–72, 10 S.Ct. 295, 298, 33 L.Ed. 642 (1890). *See* Vienna Convention on the Law of Treaties, art. 31(1) [17]; Restatement (Second) of Foreign Relations Law of the United States, § 147(1)(a) (1965).

Article 32 of the Vienna Convention provides for supplementary means of interpretation when analysis according to Article 31 "leaves the meaning ambiguous or obscure". Perhaps both sides have had this provision in mind as they have sought to embellish the record with after-the-fact presentations regarding governmental intentions in entering into the Understanding. For example, R.Doc. 72 is a memorandum apparently drafted some six months past the date of the Understanding, April 23, 1985, by the Director of the ITA's Office of Policy, setting forth *his* interpretation thereof upon representations that he drafted the contested injury-test article (5) and that the principal U.S. negotiator "agrees with [this] interpretation". *See also* R.Doc. 87. On the other hand, R.Doc. 86 and Exhibit A to plaintiff's reply brief are

letters sent in 1986 by the Mexican Minister for Trade & Fiscal Affairs, presenting his country's point of view, albeit well after the moment of publication of the ITA's determination now under review. Finally, during the course of this litigation, bills in Congress have been brought to the court's attention which allegedly reflect domestic executive and legislative recognition and concern for the issues herein.[18]

While these presentments are illuminating, the court has concluded in Point I above that section 701 of the Trade Agreements Act governs this case, challenging, as it does, agency action under the facts and circumstances existent in 1985. Moreover, if 19 U.S.C. § 1303(a)(2) were the controlling statute, this court is not persuaded that its reference to "the international obligations of the United States" means, as the defendants and intervenor-defendants infer, only GATT membership. While legislative history is not clear on this point [19], it is evident that the term "agreement" means the Agreement on Interpretation and Application of Articles VI, XVI and XXIII of the General Agreement of Tariffs and Trade (relating to Subsidies and Countervailing Measures) and that section 303 does not apply to products from Agreement countries.[20] Since the cement from Mexico qualifies as such a product by pronouncement of the U.S. Trade Representative [*see* pages 1561–62 *supra*], section

---

17. *Opened for signature* May 23, 1969, 1155 U.N.T.S. 331, 340, *reprinted in* 63 Am.J.Int'l L. 875, 885 (1969).

18. *See* H.R. 3, 100th Cong., 1st Sess. § 168 (1987) and Subcomm. on Trade of H.R. Comm. on Ways & Means, 100th Cong. 1st Sess., Report of Amendments to H.R. 3, pp. 60–61 (Comm. Print 1987); S. 539, 100th Cong., 1st Sess. § 5008(d) (1987) and 133 Cong.Rec. S2158 (daily ed. Feb. 19, 1987).

The version of H.R. 3 called to the court's attention would have amended section 303 by providing the ITC with authority to conduct an injury test where the requirement for one arises after a countervailing duty order has been issued. If the ITC determined the existence of injury, the order would remain in effect and countervailing duties would continue to be collected; if not, it would be revoked.

19. *Compare, e.g.,* S.Rep. No. 1298, 93rd Cong., 2d Sess. 185 (1974), U.S.Code Cong. & Admin. News 1974, p. 7186 *and* S.Rep. 249 at 39 and 103, U.S.Code Cong. & Admin.News 1979, pp. 425, 489 *with* S.Rep. 249 at 43 and 45, U.S.Code Cong. & Admin.News 1979, pp. 429, 431.

20. *See* S.Rep. 249 at 37 and 103, U.S.Code Cong. & Admin.News 1979, pp. 423, 489. The legislative history to the 1979 amendments to section 303 states that

[d]uty-free articles from certain countries will be subject to countervailing duties after an injury determination, but only if international obligations of the United States, *other than the Agreement on Subsidies and Countervailing Measures,* require that determination with respect to products of those countries.

*Id.* at 103, U.S.Code Cong. & Admin.News 1979, p. 489 (emphasis added).

303 does not control, whether or not "international obligations" signify only GATT.

### III

As stated at pages 1560–61 above, the relief the plaintiff and intervenor-plaintiff Cementos de Chihuahua, S.A. seek is revocation of the CVD order, which the ITA opposes based upon the view that section 303 does control and its interpretation of the Understanding. Although not explicitly addressed in either the agency's final determination now under review or in the papers submitted by the defendants, a request for revocation had been made by the respondent (now plaintiff) on August 14, 1985[21] under 19 C.F.R. § 355.42, which provides, in part:

> Revocation of Countervailing Duty Order and termination of suspended investigation.
>
> (a) *In general.* Whenever the Secretary determines that a subsidy within the meaning of [19 U.S.C. § 1677(5)] is no longer being bestowed upon the manufacture, production or exportation of merchandise which is the subject of a Countervailing Duty Order and is satisfied that there is no likelihood of resumption of the subsidy, he may act to revoke or terminate, in whole or in part, such order or suspended investigation. Ordinarily, consideration of such revocation or termination will be made only subsequent to a review as described in § 355.41.
>
> (b) *Application to revoke or terminate.* An application for the revocation of any Order ..., premised upon the lack of a legal basis for the imposition of countervailing duties, may be submitted in writing by an interested party to the Secretary together with detailed information demonstrating that the imported merchandise no longer benefits from a net subsidy....[22]

In conjunction with its request for revocation, the respondent sought a review pursuant to 19 U.S.C. § 1675(b) based upon the "changed circumstances" that

have occurred in this matter in the form of Mexico's new status as a "country under the Agreement" and the U.S.'s new obligation to apply an injury test in CVD cases involving Mexican imports. R.Doc. 60 at 10.

A finding of changed circumstances within the meaning of section 1675(b) engenders a review pursuant to subsection (a) of 19 U.S.C. § 1675 prior to consideration of revocation of an order. *See Gilmore Steel Corporation v. United States,* 11 CIT ——, ——, 672 F.Supp. 1459, 1463 (1987). To enable the ITA to reconsider the status of its CVD order in the light of this opinion, the court considers remand of the final results of its administrative review necessary, having concluded that section 701 is to be followed in this case and that the agency erred in relying on section 303. The court notes in this regard the determination in *Certain Fasteners from India,* 47 Fed.Reg. 44,129 (Oct. 6, 1982), cited by the plaintiff, which followed an ITA conclusion that circumstances had changed sufficiently to warrant conducting an administrative review. *See* 47 Fed.Reg. 29,695 (July 8, 1982). In that matter, the merchandise subject to the original CVD order had since acquired duty-free status. The October 1982 determination states, in part:

> ... By statute, the Department is authorized to impose countervailing duties on duty-free products from GATT member countries only if the [ITC] has found that imports of the merchandise materially injure ... a United States industry. There has been no such determination with respect to duty-free fasteners ... covered by this order. As a result, the Department is revoking the [CVD] order.... 47 Fed.Reg. at 44,129.

### IV

While the court need not dispose of the remaining issues raised by the motions herein, it may be instructive to state in view of the foregoing decision to remand that the plaintiff and intervenor-plaintiffs

---

**21.** *See* R.Doc. 60.

**22.** This regulation is based upon 19 U.S.C. § 1675(c).

have not borne their burdens of persuasion that they are entitled to the relief requested on those issues in the face of the broad administrative discretion of the ITA.

As to the first issue, the plaintiff urges the court to find that the ITA erred in assessing "country-wide" rather than separate CVD rates for each importer of Mexican cement. Intervenor-plaintiffs Cementos Guadalajara, S.A. de C.V., Cementos Mexicanos, S.A. de C.V., Cementos Portland Nacional, S.A. de C.V. and Cementos Veracruz, S.A. de C.V. have moved to remand the case on this ground, while intervenor-plaintiff Cementos de Chihuahua, S.A. supports the ITA's approach except for its failure to include in the country-wide rate those companies with *de minimis* countervailable benefits.

The statutory provision governing the issue was amended by the Trade and Tariff Act of 1984, § 607, 98 Stat. at 3029 (codified at 19 U.S.C. § 1671e(a)(2)). By that amendment, as explained in *Ceramica Regiomontana, S.A. v. United States*, 10 CIT ——, 636 F.Supp. 961, 968 (1986), *aff'd*, 810 F.2d 1137 (Fed.Cir.1987),

> Congress has endorsed the practice of publishing a country-wide countervailing duty rate by enacting a legislative presumption in favor of a country-wide rate.... The legislative history of the Act indicates that:
>
>> This provision is intended to lessen the administrative burden on the administrative authority stemming from implementing company-specific rates. The amendment continues to permit individual company rates for significant differences in benefits. [citations omitted]

Company-specific rates *may* apply according to section 1671e(a)(2) if

> (A) the administering authority determines there is a significant differential between companies receiving subsidy benefits, or

(B) a stated-owned enterprise is involved....

Thus, contrary to the import of its seemingly still-existing regulations, the ITA is not required to provide for differing rates.[23]

In explaining its assessment of duties based upon an overall rate of 3.5 percent *ad valorem* on those firms found to be receiving other than *de minimis* benefits, the agency stated that

> the record of this review shows that the number of companies has risen from five to eight.... Further, the spread, either measured as the exporters wish (from lowest to highest) or as we believe correct (as a variance from the country-wide average ...) is much smaller than before. The spread from the country-wide average is in fact so small that it is not significant. 50 Fed.Reg. at 51,734.

Defendant's Memorandum states further (at page 23 and at page 25):

> ... In the administrative review, the spread between the lowest and highest individual rates was less than half as great as the spread that occurred in the original investigation....
>
> ... In this case, the Commerce Department exercised its discretion by determining that the differences in the amounts of the subsidies received by the individual Mexican cement companies were not sufficiently significant to overcome the newly-enacted statutory presumption in favor of country-wide rates.

Congress indicated through its 1984 amendment that the use of country-wide rates is to be the rule rather than the exception. The ITA's discretion in this regard is not controlled by the degree of administrative burden in calculating company-specific rates, as asserted by some of the parties.[24] Rather, it is affected when "there is a significant differential between companies". 19 U.S.C. § 1671e(a)(2). The record indicates that the ITA considered

---

**23.** *Compare* 19 U.S.C. § 1671e(a)(2) *with* 19 C.F.R. § 355.33(f). *See also* 50 Fed.Reg. 24,207, 24,226 (June 10, 1985) (Proposed rule and request for comments (§ 355.22(d) Calculation of Individual Rates)).

**24.** *See, e.g.,* Plaintiff's Memorandum, pp. 34–37. *See generally* Memorandum of Points and Authorities of intervenor-plaintiffs Guadalajara *et al.*

the differential [25] and found it not significant. *See* 50 Fed.Reg. at 51,734.

In view of both the change in the law and in the facts since publication of the original CVD order, this court cannot conclude that that finding is unsupported by substantial evidence on the record or otherwise not in accordance with law within the meaning of 19 U.S.C. § 1516a(b)(1)(B).

Reliance on *Philipp Brothers, Inc. v. United States*, 10 CIT ——, 630 F.Supp. 1317 (1986), to support company-specific rates for this administrative review does not aid the plaintiff. That decision held, among other things, that the ITA must indicate on the record its justification for changing to average assessment of countervailing duties during a review when company-specific rates are used in its original order. Here, the defendant has provided the necessary justification for its change to country-wide rates in the final results. *See* 50 Fed.Reg. at 51,733–34.

The position of the plaintiff and intervenor-plaintiff Cementos de Chihuahua, S.A. that, assuming correct use of a country-wide rate, the ITA nevertheless erred by not including in its calculation the *de minimis* rates of other cement firms is of some moment, but, without statutory or regulatory direction of the agency in this regard, the court cannot conclude that the average assessment figure is incorrect as calculated. "[T]he *de minimis* rule deals with the unique question of when subsidization ceased". *Id.* at 51,734. Those firms with subsidization rates determined to be below 0.5 percent are deemed by the ITA as receiving no bounties or grants and are treated "in the same manner as ... firms receiving no benefits whatsoever". *Ipsco, Inc. v. United States*, 12 CIT ——, ——, 687 F.Supp. 613, —— (1988). In calculating the average assessment for those receiving benefits, the agency included the rates of all such recipients. The court considers the "affirmative" rate adequately representative of the industry, and the ITA's failure to include rates not considered countervailable in the calculation of those countervailable is not erroneous. *Cf. Fabricas el Carmen, S.A. de C.V. v. United States*, 11 CIT at ——, 672 F.Supp. at 1479.

\* \* \* \* \* \*

As to the valuation of short-term loans from the Fund for the Promotion of Exports of Mexican Manufactured Products ("FOMEX"), the plaintiff challenges the ITA's (1) allocating entire benefit to the period under review rather than over the loan term and (2) using nominal, rather than effective, preferential rates and commercial benchmarks in calculating the benefit received. *See* Plaintiff's Memorandum, pp. 42–44.

Apparently, it is ITA policy to allocate all of the benefit of short-term-loan interest rates to the time when the interest is paid, *i.e.*, in this case, during the period under review. While plaintiff's preferred method of calculation—reflecting the financing actually received between July 1 and December 31, 1983—may be a reasonable alternative, the ITA's method is not thereby erroneous. *See, e.g., Zenith Radio Corporation v. United States*, 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978).

The same conclusion attaches to the ITA's use of nominal rates in its calculation of FOMEX benefits. Although, as the staff itself has stated, comparison of effective rates is preferred [26], in this case the ITA apparently did not possess reliable information concerning repayment dates, compensation balance requirements, collateral requirements, and fees and commissions. *See* 50 Fed.Reg. at 51,735. Rather, it used "the weighted average FOMEX pre-export and export rates" and compared them to the nominal commercial rates in

---

**25.** *See* confidential document 6. The plaintiff challenges the appropriateness of determining the spread as a variance from the country-wide average, the preferred measurement of the defendant. *See* Plaintiff's Memorandum, p. 39.

The court stated in *Fabricas el Carmen, S.A. de C.V. v. United States*, 11 CIT ——, ——, 672 F.Supp. 1465, 1480 (1987), that "the difference is to be evaluated by comparing levels of benefits among companies, rather than by comparing a country-wide rate and the rate of subsidization of a particular company".

**26.** *See, e.g.,* R.Doc. 38 (Feb. 19, 1985 Memorandum from international trade analyst/IA to file re: interest rate discussion).

Mexico, which were based upon the following:

> ... For peso-denominated loans we used as a benchmark the average of the nominal interest rates published monthly by Banco de Mexico in the *Indicadores Economicos.* For dollar-denominated loans, we used information obtained from the U.S. Federal Reserve Board. 50 Fed. Reg. at 27,477.

Contrary to plaintiff's contention, neither approach is unreasonable. *See Alhambra Foundry v. United States,* 9 CIT 632, 635, 626 F.Supp. 402, 407 (1985). *See also Fabricas el Carmen, S.A. de C.V. v. United States,* 11 CIT at ——, 672 F.Supp. at 1473–74.

### Conclusion

In view of the foregoing, the motions for judgment on the agency record must be granted in part. Now, therefore, in conformity with the above opinion, it is

ORDERED that this matter be, and it hereby is, remanded to the International Trade Administration, U.S. Department of Commerce for reconsideration of the final determination of its first administrative review of the order *sub nom. Final Affirmative Countervailing Duty Determination and Countervailing Duty Order; Port-land Hydraulic Cement and Cement Clinker from Mexico,* 48 Fed.Reg. 43,063 (Sept. 21, 1983), in the light of the court's opinion that no countervailing duties can be imposed upon the entries from Mexico of Portland hydraulic cement and cement clinker other than white, nonstaining for the period July 1 through December 31, 1983 and at issue in this case unless it is determined that those entries, by reason of subsidy, are causing or threatening to cause material injury to an industry in the United States or that they retard materially the establishment of an industry in the United States; and it is further

ORDERED that the defendants and their successors in office, officers, employees, agents, servants, sureties and assigns be, and they hereby are, enjoined from imposing countervailing duties upon the entries from Mexico of Portland hydraulic cement and cement clinker other than white, nonstaining for the period July 1 through December 31, 1983 and at issue in this case unless it is determined that those entries, by reason of subsidy, are causing or threatening to cause material injury to an industry in the United States or that those entries retard materially the establishment of an industry in the United States; and it is further

ORDERED that the motions of the plaintiff and the intervenor-plaintiffs for judgment upon the agency record be, and they hereby are, denied in all respects other than as set forth hereinabove.