IPSCO, INC., and Ipsco Steel, Inc.,
Plaintiffs–Appellants,

v.

The UNITED STATES,
Defendant–Appellee,

Lone Star Steel Company,
Defendant.

No. 89–1486.

United States Court of Appeals,
Federal Circuit.

April 3, 1990.

Rufus E. Jarman, Jr., Barnes, Richardson & Colburn, New York City, with whom Josephine Belli was on brief, argued for plaintiffs-appellants.

Jeanne E. Davidson, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for defendant-appellee. Stuart E. Schiffer, Acting Asst. Atty. Gen., David M. Cohen, Director and Platte B. Moring, III, Atty., Commercial Litigation Branch, Dept. of Justice, of Washington, D.C., were on the brief for defendant-appellee. Also on the brief were Wendell L. Willkie, III, Gen. Counsel and Stephen J. Powell, Chief Counsel for Import Admin., of counsel.

Before NEWMAN and MAYER, Circuit Judges, and DUMBAULD, Senior District Judge.*

## OPINION

MAYER, Circuit Judge.

Ipsco, Inc. and Ipsco Steel, Inc. (Ipsco) appeal the judgment of the United States Court of International Trade, *Ipsco, Inc. and Ipsco Steel, Inc. v. United States*, 710 F.Supp. 1581 (Ct. Int'l Trade 1989) (*Ipsco III*), affirming the second remand determination of the International Trade Administration of the Department of Commerce (ITA) that countervailable subsidies are being provided to Canadian manufacturers, producers and exporters of oil country tubular goods and that the net subsidy is 0.66 percent ad valorem for all companies not

excluded from the countervailing duty determination.

## Background

On July 22, 1985, the Lone Star Steel Company and CF & I Steel Corp., producers of oil country tubular goods (OCTG) in the United States, filed a petition with the ITA alleging that manufacturers and exporters of OCTG in Canada directly or indirectly receive subsidies and that imports of these products materially injure or threaten to materially injure a United States industry. *See* 19 U.S.C. § 1671 (1988); 19 C.F.R. § 355.26 (1988). The ITA initiated a countervailing duty investigation on August 12, 1985. 50 Fed.Reg. 33383. A questionnaire directed to the petitioners' allegations was presented to the government of Canada. Responses were received from it as well as from the provincial governments of Alberta, Ontario and Saskatchewan, and from producers that account for nearly all exports of OCTG from Canada to the United States.

Each of the eleven known Canadian producers and exporters of OCTG filed timely requests for exclusion under 19 C.F.R. § 355.38 (1988). Detailed questionnaires were sent to these companies, and ten of them, including Ipsco, responded. Eight firms reported that they received no benefits and one, Algoma Steel Corp. Ltd., said it did but the ITA determined they were below the de minimis rate of 0.50 percent. Therefore, these nine firms were excluded from the preliminary determination issued on December 19, 1985. 50 Fed.Reg. 53172, 53173. The ITA determined from Ipsco's response that it received countervailable benefits above the de minimis level. *Id.* The responses were verified. Using the data submitted by Ipsco, the ITA preliminarily determined that the estimated net subsidy for OCTG was 0.72 percent ad valorem. *Id.*

The ITA's conclusions remained unchanged in its final affirmative countervail-

* Edward Dumbauld, Senior District Judge, United States District Court for the Western District of Pennsylvania, sitting by designation.

ing duty determination issued on April 16, 1986. 51 Fed.Reg. 15037. The above rate applied to all companies except those specifically excluded from the determination. *Id.* Therefore, the rate applied to Ipsco and Siegfried Kreiser Pipe and Tube which did not respond to the ITA's questionnaire. On June 9, 1986, after receiving notice of the International Trade Commission's determination that imports of OCTG from Canada were materially injuring a United States industry, the ITA issued a countervailing duty order. *Id.* at 21783.

The ITA determined that countervailable subsidies were being provided under an investment tax credit program, a regional development incentive program and a general development agreement, and that Ipsco and Algoma received benefits under these programs. 50 Fed.Reg. 15038–40. The benefit was calculated for each company by determining the amount of the tax credit or grant allocable to the review period (calendar year 1984) and dividing that amount by each company's total sales during that period. Grants received by Ipsco for use in its iron and steel production facilities were apportioned between OCTG and other products according to the sales value of the products. Non-de minimis one-time grants were allocated using the declining balance method over the average useful life of equipment in the steel industry according to Internal Revenue Service tables, 15 years.

Ipsco objected to the countervailing duty determination, because the ITA (1) incorrectly determined that the country-wide rate was the rate found for Ipsco, the only non-excluded company that responded to the ITA questionnaire, when it should have divided the total subsidies provided to all companies by the total sales of all companies, (2) should have apportioned the grants according to the weight of steel in each product rather than according to sales value, and (3) should have amortized the grants over 25 years, which Ipsco uses in its own financial reporting, rather than over 15 years. Ipsco challenged the determination in the Court of International Trade, which upheld ITA's methods of calculating the country-wide rate and appor-

tioning grants among Ipsco's products, but remanded the determination for an explanation of the basis for the choice of a 15–year amortization period. *Ipsco, Inc. and Ipsco Steel, Inc. v. United States,* 687 F.Supp. 614 (Ct. Int'l Trade 1988) (*Ipsco I* ). In its first remand determination, the ITA reaffirmed that its use of a 15–year period was appropriate, and in *Ipsco, Inc. and Ipsco Steel, Inc. v. United States,* 701 F.Supp. 236 (Ct. Int'l Trade 1988) (*Ipsco II* ), the court remanded the determination again, holding that the 15 year period is not supported by substantial evidence nor in accordance with law. In its second remand determination, the ITA calculated a 21–year amortization period by dividing the total value of Ipsco's depreciable physical assets by the net depreciation charged per year. Using this allocation period, the net subsidy was determined to be 0.66 percent ad valorem. The Court of International Trade affirmed this determination.

### Discussion

Ipsco argues that the trial court erred in upholding the ITA's determination because it excluded those Canadian producers of OCTG that received no countervailable benefits or de minimis benefits from the calculation of a country-wide rate. It maintains that proper adherence to the statutes and regulations governing countervailing duty determinations requires that an average country-wide rate be calculated by dividing the total benefit received by the Canadian industry by the industry's total sales. We agree. We do not agree, however, with Ipsco's other two objections: that the court erred in sustaining the ITA's method of apportioning grants among Ipsco's products and its use of a 21–year amortization period.

■ In reviewing the trial court's affirmance of the ITA's countervailing duty determination, we must decide whether it correctly concluded that the ITA's methodology is in accordance with law and its conclusions are supported by substantial evidence. We give due weight to the agency's interpretation of the statute it administers, and we accept that interpretation if it

is "sufficiently reasonable." *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978) (quoting *Train v. Natural Resources Defense Council*, 421 U.S. 60, 75, 95 S.Ct. 1470, 1479, 43 L.Ed.2d 731 (1975)); *Industrial Fasteners Group, Am. Importers Ass'n v. United States*, 710 F.2d 1576, 1580 (Fed.Cir.1983). On the other hand, we cannot sustain the ITA's exercise of administrative discretion if it contravenes statutory objectives. "Expert discretion is the lifeblood of the administrative process, but 'unless we make the requirements for administrative action strict and demanding, *expertise*, the strength of modern government, can become a monster which rules with no practical limits on its discretion'." *Motor Vehicle Mut. Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48, 103 S.Ct. 2856, 2869, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962) and *New York v. United States*, 342 U.S. 882, 884, 72 S.Ct. 152, 153, 96 L.Ed. 662 (1951) (Douglas J., dissenting)).

*Calculation of Net Subsidy*

Section 701 of the Trade Agreements Act of 1979 is the statutory basis for all countervailing duty determinations for countries like Canada that are signatories of the GATT Subsidies Code. Section 701(a) provides in pertinent part:

If—

(1) the administering authority determines that—

(A) a country under the Agreement, or

(B) a person who is a citizen or national of such a country, or a corporation, association, or other organization organized in such a country,

is providing, directly or indirectly, a subsidy with respect to the manufacture, production, or exportation of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States, and

(2) the Commission determines that—

(A) an industry in the United States—

(i) is materially injured, or

(ii) is threatened with material injury, or

(B) the establishment of an industry in the United States is materially retarded, by reason of imports of that merchandise or by reason of sales (or the likelihood of sales) of that merchandise for importation,

then there shall be imposed upon such merchandise a countervailing duty, in addition to any other duty imposed, equal to the amount of the net subsidy.

19 U.S.C. § 1671(a) (1988). "Subsidy" is defined in subsection 771(5) of the Act:

(i) Any export subsidy described in Annex A to the Agreement. . . .

(ii) The following domestic subsidies, if provided or required by government action to a specific enterprise or industry, or group of enterprises or industries, whether publicly or privately owned, and whether paid or bestowed directly or indirectly on the manufacture, production, or export of any class or kind of merchandise:

(I) The provision of capital, loans, or loan guarantees on terms inconsistent with commercial considerations.

(II) The provision of goods or services at preferential rates. .

(III) The grant of funds or forgiveness of debt to cover operating losses sustained by a specific industry.

(IV) The assumption of any costs or expenses of manufacture, production, or distribution.

*Id.* § 1677(5)(A). The next subsection defines "net subsidy", permitting the ITA to offset any gross subsidy by certain fees, taxes, duties, and the like. *Id.* § 1677(6).

Neither the countervailing duty statute nor the applicable regulations promulgated by the Department of Commerce, 19 C.F.R. § 355.0 et seq. (1988), specifically state how a "net subsidy" is calculated. The regulations simply provide: "If the Determination is affirmative, the amount of the net subsidy shall be estimated and stated, and the nature of the subsidy determined. If separate enterprises have received materially

different benefits, such differences shall be estimated and stated." *Id.* § 355.33(f).**

When the net subsidy is de minimis, the ITA issues a negative countervailing duty determination. For example, in Welded Carbon Steel Line Pipe From Taiwan, 50 Fed.Reg. 53363 (1985) (final negative determination), the benefits received by the two known producers of the subject goods in Taiwan were allocated over the value of their exports during the review period and found to be 0.02 percent ad valorem and therefore de minimis. In Pads for Woodwind Instrument Keys From Italy, 49 Fed. Reg. 17793 (1984) (final negative determination), the only company that received countervailable benefits was found to have been subsidized at a de minimis rate of 0.05 percent of its total sales. The Department of Commerce has memorialized this practice by regulation, 19 C.F.R. § 355.8 (1988): "For purposes of this part, the Secretary will disregard any aggregate net subsidy that the Secretary determines is less than 0.5% ad valorem, or the equivalent specific rate." *See* 52 Fed.Reg. 30660 (August 17, 1987). But Commerce did not define "aggregate net subsidy" or say how it is to be calculated. It only stated that, where the weighted-average country-wide or company-specific rate is de minimis, no countervailing duty will be assessed. *Id.* at 30662.

The ITA excludes from the countervailing duty determination both companies that receive no benefit and those getting de minimis benefits from subsidy programs. But the applicable aspect of the regulation, 19 C.F.R. § 355.38 (1988), provides: "Any firm which does not benefit from a subsidy alleged or found to have been granted to other firms producing or exporting the merchandise subject to the investigation shall, on timely application therefor, be excluded from a Countervailing Duty Order." *See* 45 Fed.Reg. 4932, 4936 (January 22,

1980). This regulation supports the exclusion of companies from a countervailing duty *order*, but it does not direct the ITA to disregard companies receiving little or no subsidy from the calculation of an average net subsidy.

The ITA's practice in taking into account export sales by firms eligible for exclusion in the calculation of the net subsidy varies. For example, in Bricks From Mexico, 49 Fed.Reg. 19564, 19568 (1984) (final affirmative determination and order), the ITA excluded three firms that had filed applications under 19 C.F.R. § 355.38 (1988) and had received no benefits or received benefits in de minimis amounts. Nevertheless, the net subsidy was determined by allocating the countervailable benefits from export financing programs received by the 67 firms identified by the Mexican government over the "total brick exports to the United States during the review period." 49 Fed.Reg. at 19565. In Carbon Steel Wire Rod From New Zealand, 51 Fed.Reg. 7971 (1986) (final affirmative determination and order), on the other hand, the ITA determined the rate at which each of the two known producers and exporters were being subsidized, excluded one of these firms because it received only a 0.04 percent ad valorem subsidy, and charged a countervailing duty equal to the net subsidy (25.69 percent ad valorem) found for the other firm. Similarly, in Certain Carbon Steel Products From Sweden, 50 Fed.Reg. 33375 (1985) (final affirmative determination), the country-wide countervailing duty (8.77 percent ad valorem) was equal to the net subsidy found for the one non-excluded company where there were two known producers and exporters.

It appears, therefore, that the ITA has no consistent method for calculating the net subsidy when there are both producers

** The ITA issued new regulations effective January 26, 1989. 53 Fed.Reg. 52306, 52344 (December 27, 1988), codified at 19 C.F.R. § 355.1 et seq. (1989). Under the new regulations, a person who "did not apply for or receive any net subsidy" may request exclusion from a countervailing duty order, *id.* § 355.14, but persons requesting exclusion who have received a de minimis subsidy when the "weighted-average net subsidy calculated on a country-wide basis" is greater than de minimis are charged an individual rate, *id.* § 355.20(d), (e). The government indicated during oral argument that, under the new regulations, firms that receive a net subsidy of zero or de minimis are included in the calculation of the country-wide average net subsidy.

and exporters receiving a non-de minimis subsidy and others that receive no subsidy or only a de minimis subsidy. This inconsistency about whether companies receiving a de minimis benefit may be ignored in the calculation of the net subsidy is also reflected in the cases from the Court of International Trade. *Compare Fabricas el Carmen, S.A. v. United States,* 672 F.Supp. 1465, 1478 (Ct. Int'l Trade 1987) (instructing the ITA not to disregard excluded firms from the calculation of a country-wide rate, where there were over 2000 producers and exporters) *with Cementos Anahuac del Golfo, S.A. v. United States,* 687 F.Supp. 1558, 1568 (Ct. Int'l Trade 1988) (upholding the ITA's determination where there were eight producers and exporters and the ITA excluded the de minimis rates of some firms from its calculation of a country-wide rate), *rev'd on other grounds,* 879 F.2d 847 (Fed.Cir.1989).

It strikes us that there is a hint of ad hoc adjudication at work in this scheme. Whether or not this is sustainable as a general proposition, we believe that the method of calculating the rate applied to Ipsco's exports in this case was unreasonable. Congress created a presumption in favor of country-wide countervailing duty rates. 19 U.S.C. § 1671e(a)(2) (1988) (countervailing duty orders "presumptively apply to all merchandise of such kind or class exported from the country investigated"). It was inconsistent with the concept of a country-wide rate for the ITA to disregard those companies receiving no benefit or a de minimis benefit when it determined the amount of the net subsidy and whether it was more than de minimis. "Unlike the antidumping law, which is directed to company-specific activity, the countervailing duty law is directed at government or government-sponsored activity." 53 Fed. Reg. 52306, 52325. The purpose of countervailing duties is to discourage foreign subsidization that results in injury to a United States industry because of unfair competition from cheaper imports. To assess a countervailing duty against a single company that was receiving a benefit just above the de minimis level, when many other producers and exporters received no

benefit or an insignificant benefit, does not advance this purpose.

There is no evidence that the Canadian government subsidized "the manufacture, production, or exportation of a class or kind of merchandise", 19 U.S.C. § 1671(a) (1988), only that it attempted to aid a single ailing firm. Where the overall level of subsidization provided to a particular industry by a foreign government is de minimis, no countervailing duty should be assessed. And, if there is a non-de minimis subsidy being provided, the countervailing duty should not exceed the weighted-average benefit received by all firms that produce or export the subject goods, including those firms that receive little or no subsidy.

The country-wide countervailing duty rate that applies to imports from the investigated country must bear some relation to the approximate average rate of subsidization of the subject goods. This rule applies equally to cases, like this one, where there are only a small number of known producers or exporters of the products. This view is compelling in light of 19 U.S.C. § 1671e(a)(2) (1988), which requires the application of the same countervailing duty to all merchandise imported from the country being investigated, unless the ITA "determines there is a significant differential between companies receiving subsidy benefits or a State-owned enterprise is involved."

The ITA's own regulations appear to lead to this conclusion. First, 19 C.F.R. § 355.8 (1988) provides that the Secretary of Commerce will disregard any *aggregate* net subsidy that is less than 0.5% ad valorem. Second, 19 C.F.R. § 355.38 (1988) authorizes the exclusion of firms from the *countervailing duty order,* but not from the calculation of the amount of the net subsidy. These regulations suggest that the proper procedure is for the ITA to calculate a weighted-average net subsidy by dividing the sum of all the benefits provided in subsidy of the subject goods by the total value of export sales of the goods to the United States. If this net subsidy is

de minimis, the countervailing duty determination should be negative.

*Apportioning the Grants*

■ We see no error in the trial court's approval of the method used by ITA to apportion the grants received by Ipsco among its various products. The ITA apportioned the grants according to the sales value of OCTG relative to the sales value of Ipsco's other products that benefited from the grants. The ITA found that the grants were not tied to the production of a particular product. Therefore, it had no basis for concluding that one product was subsidized to a greater extent than any other produced by Ipsco.

Ipsco argues that the countervailable benefits were expressly tied to the production of flat rolled steel in its steel production facility in Saskatchewan; that OCTG is not produced in this facility; that OCTG benefited only from the use of the subsidized flat rolled steel; and that, because the grants benefited only one product, it was irrational to allocate the grants on the basis of sales value, which was disproportionately high for OCTG because of extensive further processing. According to Ipsco, the ITA should have apportioned the grants using a ratio based on the weight of steel produced with the equipment purchased with the grants.

Ipsco's arguments are based on facts that contravene the findings made by the ITA in its final affirmative countervailing duty determination and which the trial court did not disturb. The apportioned grants were made under the Regional Development Incentive Program (RDIP), the General Development Agreement (GDA), and the Canada–Saskatchewan Subsidiary Agreement on Iron, Steel and Other Related Metal Industries. About the RDIP grants, the ITA wrote, "IPSCO and Algoma each received RDIP grants which were used for several facilities producing both OCTG and other products." 51 Fed.Reg. at 15039 (final affirmative determination). On the GDA grants, the ITA found,

> The iron and steel subsidiary agreement in Saskatchewan was intended to enhance the viability of the existing iron and steel industry in the province, to expand and diversify iron and steel production, and to increase employment opportunities in the iron, steel and other related metal industries in Saskatchewan. IPSCO was and still is the only producer in Saskatchewan of pipe (including OCTG) in addition to being the sole steel producer in the province.

51 Fed.Reg. at 15040. According to these findings, Ipsco received RDIP grants for facilities other than its Saskatchewan plant, and the GDA grants were for the general improvement of Ipsco's Saskatchewan steel production facility; they were not tied to any particular product. Ipsco does not suggest that these findings are not based on substantial evidence. Ipsco said in its response to the ITA's questionnaire that both the RDIP and GDA grants were a certain percentage of approved and expended capital costs. Because the grants were not tied to any particular product, it was reasonable for the ITA to use its standard method of apportioning them according to sales value.

*Amortization Period*

■ We also see the ITA's use of a 21–year period over which to amortize the non-recurring grants received by Ipsco as unobjectionable. The ITA calculated this average depreciation period by "subtracting from the total value of [Ipsco's] replaceable physical assets the value of construction in progress (which was not depreciated), and then divided this result by the net depreciation [taken on a straight-line basis] charged during the year." The data was taken from Ipsco's 1984 annual report. Ipsco argues that the ITA should not have considered the useful life of all of its depreciable assets, only those which it actually purchased with the government grants. This is not persuasive because the grants were not tied to the purchase of any particular capital assets. Use of the subsidy to purchase a particular piece of equipment freed other funds for the purchase of other capital assets.

### Conclusion

Accordingly, the judgment of the Court of International Trade is affirmed in part, reversed in part, and the case is remanded for further proceedings in accordance with this opinion.

### COSTS

No costs.

**AFFIRMED IN PART, REVERSED IN PART AND REMANDED.**

