**CEMENTOS ANAHUAC del GOLFO, S.A., Plaintiff,**

v.

**UNITED STATES, Defendant.**

Court No. 86–12–01607.

United States Court of International Trade.

June 9, 1988.

Rogers & Wells (Eugene T. Rossides and Robert E. Ruggeri, Washington, D.C., on the motion), for plaintiff.

John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., (Velta A. Melnbrencis, Asst. Director, New York City, on the motion); and Douglas A. Riggs, General Counsel, M. Jean Anderson, Chief Counsel for Intern. Trade Office of the Deputy Chief Counsel for Import Admin., U.S. Dept. of Commerce (Craig L. Jackson, Washington, D.C., of counsel on the motion), for defendant.

Stewart and Stewart, (Eugene L. Stewart, Terence P. Stewart, D. Scott Nance, Washington, D.C., on the amici brief); Cabot Corp., (William L. May, Jr., Boston, Mass., of counsel on the brief); and PPG Industries, Inc. (Glenn Miller, Pittsburgh, Pa., of counsel on the brief), supporting defendant as amici curiae.

## MEMORANDUM OPINION AND ORDER

CARMAN, Judge:

Plaintiff Cementos Anahuac del Golfo, S.A., (plaintiff) commences this action pursuant to section 516A of the Tariff Act of 1930 (the Act) as amended 19 U.S.C. § 1516a and 28 U.S.C. § 1581(c) (1986). The plaintiff contests the Department of Commerce, International Trade Administration's (ITA) administrative review of its countervailing duty order (CVD order) investigation pursuant to section 751 of the Act, as amended, 19 U.S.C. § 1675 (1986), (751 review), of portland hydraulic cement and cement clinker (PHC) from Mexico. *Portland Hydraulic Cement and Cement Clinker From Mexico; Final Results of Countervailing Duty Administrative Review,* 51 Fed.Reg. 44500 (1986). The review under appeal covered entries made from January 1, 1984 through December 31, 1984 and was the second administrative 751 review of the countervailing duty order.[1]

---

1. Plaintiff filed a separate action with this Court, *Cementos Anahuac del Golfo, S.A. v. United States,* Court No. 86–01–00082, challenging the first 751 review of the original CVD order.

Plaintiff brought the action to challenge the final results of the ITA's 751 review claiming it was unsupported by substantial evidence and otherwise contrary to law. Plaintiff's action also contests the decision of the ITA to not revoke the CVD order, to continue to conduct future 751 reviews based upon the CVD order, and to continue to direct the U.S. Customs Service (Customs) to collect estimated duty deposits on future entries.

Plaintiff now moves for summary judgment, pursuant to Rules 56.1(a), and (c) and 81(j) of the rules of this Court, asking this Court to: (1) direct the ITA to revoke the CVD order; and (2) direct the ITA to take the necessary steps to ensure, in accordance with the revocation, all remaining unliquidated entries of the relevant merchandise are liquidated without the assessment of any countervailing duties.

Defendant Government urges the Court to deny plaintiff's motion, enter judgment in favor of the defendant, and sustain the final results of the 751 review of the CVD order on PHC from Mexico. Amici curiae support defendant's position. Upon review of the material facts as to which there is no genuine issue, the Court denies plaintiff's motion, enters judgment for the defendant, and sustains the final results of the second 751 review of the CVD order on PHC from Mexico, 51 Fed.Reg. 44500, as set forth in this slip opinion.

## FACTS

The following facts are not in dispute. On March 8, 1983, the United States Department of Commerce (Commerce) received a petition filed on behalf of the United States producers of PHC. The petition alleged manufacturers, producers, or exporters of PHC in Mexico received, directly or indirectly, bounties or grants within the meaning of section 303 of the Act, as amended, 19 U.S.C. § 1303. On the basis of the petition, the ITA initiated a countervailing duty investigation, on March 28, 1983, to determine if Mexican PHC manufacturers, producers, or exporters received benefits that constituted bounties or grants. *Initiation of Countervailing Duty Investigation; Portland Hydraulic Cement and Cement Clinker From Mexico,* 48 Fed.Reg. 14019 (1983).

At the time of the investigation, Mexico was not a "country under the Agreement" within the meaning of section 701(b) of the Act, as amended, 19 U.S.C. § 1671 (1982), and therefore the ITA applied section 303 of the Act, as amended, 19 U.S.C. § 1303.

Section 1303(a)(2) provides for the imposition of duties on nondutiable goods from a country which has no international obligation with the United States requiring an injury determination, by the U.S. International Trade Commission (ITC), for the merchandise. Therefore, under § 1303, the domestic industry was not required to allege, and the ITC was not required to determine, whether the importation of the Mexican merchandise caused or threatened to cause material injury to a United States industry.

The ITA determined the investigation was "extraordinarily complicated" and published, on May 19, 1983 its statement, pursuant to section 703(c)(1)(B)(i) (1982), of the Act, as amended, 19 U.S.C. § 1671b(c)(1)(B)(i), declaring the case extraordinarily complicated and requiring additional time necessary to make a preliminary determination. *Portland Hydraulic Cement and Cement Clinker From Mexico; Postponement of Preliminary Countervailing Duty Determination,* 48 Fed. Reg. 22606 (1983).

On July 1, 1983 the ITA completed and issued its preliminary determination that benefits constituting bounties or grants were being provided to Mexican cement businesses. *Preliminary Affirmative Countervailing Duty Determination; Portland Hydraulic Cement and Cement*

---

The Court issued its slip opinion in this action, *Cementos Anahuac del Golfo, S.A. v. United States,* ⸺ CIT ⸺, 687 F.Supp. 1558 (1988). In the issuance of the present opinion, this Court has followed the rationale set forth in *Cementos Guadalajara, S.A. v. United States,* ⸺

C.I.T. ⸺, 686 F.Supp. 335 (1988), *appeal docketed,* No. 88–1400 (Fed.Cir. May 4, 1988), and has declined to follow the general rationale set forth in *Cementos Anahuac,* Slip Op. 88–58.

*Clinker From Mexico,* 48 Fed.Reg. 31437 (1983). The scope of the investigation covered PHC which was being imported under items 511.1420 and 511.1440 of the *Tariff Schedules of the United States Annotated* (TSUSA). The ITA preliminarily determined the estimated net subsidy provided by Mexico to the Mexican cement producers to be 5.69 percent *ad valorem. Id.* The ITA then directed Customs to "suspend liquidation of all entries of the products subject to this determination which are entered, or withdrawn from warehouse, for consumption, or to require a cash deposit or bond on these products in the amount equal to the estimated net subsidy." *Id.* at 31437.

The only known producers and exporters of the subject merchandise in Mexico, exported to the United States, were the following businesses: Cementos Anahuac del Golfo, S.A., (plaintiff), Cementos Guadalajara, S.A., Cementos de Chihuahua, S.A., Cementos Mexicanos, S.A., and Cooperativa Cementos Hidalgo, S.C.L. *Final Affirmative Countervailing Duty Determination and Countervailing Duty Order; Portland Hydraulic Cement and Cement Clinker From Mexico,* 48 Fed.Reg. 43063 (1983).

On September 21, 1983, the ITA published its final results of the investigation on the cement merchandise from Mexico. *Id.* Based upon its investigation, the ITA determined certain benefits constituting bounties or grants, pursuant to 19 U.S.C. § 1303, were being provided to the Mexican producers and exporters of the subject merchandise. The period of time used by the ITA, for measurement of the bounties or grants under investigation, was January 1 to December 31, 1982. *Id.* at 43064. The ITA continued to hold, in effect, the suspension of the liquidation ordered in the preliminary determination until further notice. *Id.* at 43070. The net bounties or grants for duty deposit purposes was established for each firm as follows: (1) Cementos Anahuac del Golfo, S.A., 1.64%; (2) Cementos Guadalajara, S.A., 5.13%; (3) Cementos de Chihuahua, S.A., 17.12%; (4) Cementos Mexicanos, S.A., 6.78%; (5) Cooperative Cementos Hidalgo, S.C.L., 0% and; (6)

all other manufacturers, producers, or exporters, 6.05%. *Id.*

The ITA also continued to direct Customs to require cash deposits "in the amounts indicated above for each entry of the subject merchandise entered or withdrawn from warehouse, for consumption, on or after the date of the publication of the notice in the Federal Register, and to assess countervailing duties in accordance with sections 706(a)(1) [19 U.S.C. § 1671e(a)(1)] and 751 [19 U.S.C. § 1675] of the Act." *Id.* The ITA also stated its intention "to conduct an administrative review within 12 months of the publication of this determination...." *Id.*

It should be noted the ITA, in its final affirmative determination, repeated from its preliminary determination the same following statement:

> Mexico is not a "country under the Agreement" within the meaning of section 701(b) of the Act and, therefore, section 303 of the Act applies to this investigation. The merchandise being investigated is nondutiable, but there are no "international obligations" within the meaning of section 303(a)(2) of the Act which require an injury determination for nondutiable merchandise from Mexico. Therefore, under this section the domestic industry is not required to allege that, and the U.S. International Trade Commission is not required to determine whether, imports of this product cause or threaten material injury to a U.S. industry.

*Id.* at 43064.

On April 30, 1985, the Office of the United States Trade Representative published the following:

> The Government of the United Mexican States has assumed obligations with respect to the United States which are substantially equivalent to obligations under the Agreement on the Interpretation and Application of Articles VI, XVI and XXIII of the General Agreement on Tariffs and Trade.
>
> In accordance with section 701(b) of the Tariff Act of 1930, as amended (19

U.S.C. 1671(b)), as of April 23, 1985, Mexico is a "country under the Agreement." *Determination Regarding the Application of Certain International Agreements*, 50 Fed.Reg. 18335, 18335–36 (1985). This notice was published in response to the action of the United States entering into a "substantially equivalent agreement" with Mexico entitled "Understanding between the United States and Mexico Regarding Subsidies and Countervailing Duties" (the Understanding). This bilateral agreement, signed on April 23, 1985, required, *inter alia*, the United States to find injury, or threat of injury, to a United States industry before imposing countervailing duties upon any product of Mexico. The agreement set forth, in pertinent part, as follows:

> With respect to all United States countervailing duty investigations in progress concerning products of Mexico as of the date of entry into force of this Understanding, the United States shall ensure that no countervailing duties shall be imposed upon any product of Mexico unless it is determined that the subsidized imports are, through the effects of the subsidy, causing or threatening to cause material injury to an established domestic industry, or retard materially the establishment of a domestic industry.

*Understanding Between the United States and Mexico Regarding Subsidies and Countervailing Duties*, (April 23, 1985) United States–Mexico, at ¶ 5.

On July 3, 1985, the ITA published the preliminary results of its first 751 review of the outstanding CVD order on the subject PHC from Mexico. *Portland Hydraulic Cement and Cement Clinker From Mexico; Preliminary Results of Administrative Review of Countervailing Duty Order*, 50 Fed.Reg. 27476 (1985). The review period covered PHC entered from July 1, 1983 to December 31, 1983. The ITA, in the preliminary results, concluded the total bounty or grant extended to four firms, including plaintiff and Cementos Guadalajara, was *de minimis* and the total bounty or grant extended to the remaining firms was 3.49 percent *ad valorem*. *Id.* at 27479.[2]

On November 27, 1985, the ITA published notice it had received timely requests to conduct, among other things, a second 751 review of the CVD order on PHC from Mexico covering the period of January, 1984 to December, 1984. The ITA, pursuant to 19 C.F.R. §§ 353.53a(c) and 355.-10(C), declared it would initiate this review. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 50 Fed.Reg. 48825 (1985).

The ITA published its final results on December 19, 1985 of its first 751 review of the CVD order, covering entries made from July 1, 1983 through December 31, 1983. *Portland Hydraulic Cement and Cement Clinker From Mexico; Final Results of Administrative Review of Countervailing Duty Order*, 50 Fed.Reg. 51732 (1985). The results of the first 751 review led the ITA to determine:

> the total bounty or grant during the period of review to be zero for Cementos Guadalajara, Cementos Mexicanos, Cementos Anahuac, and 0.40 percent *ad valorem* for Cementos Hidalgo and 0.499 percent *ad valorem* for Cementos Veracruz. The Department considers any

**2.** In the notice, the ITA further stated:

> The Department intends to instruct the Customs Service to assess no countervailing duties on shipments of this merchandise from the four firms with a zero or *de minimis* rate of benefit, and countervailing duties of 3.49 percent of f.o.b. invoice price on shipments from all other firms entered, or withdrawn from warehouses, for consumption on or after July 8, 1983, the date of the Department's affirmative preliminary determination, and exported on or before December 31, 1983.
> The Department intends to instruct the Customs Service not to collect a cash deposit of

> estimated countervailing duties, as provided by section 751(a)(1) of the Tariff Act, on shipments from the four firms and to collect 3.15 percent of the entered value on shipments from all other firms entered, or withdrawn from warehouse, for consumption on or after the date of publication of the final results of this administrative review. These deposit requirements shall remain in effect until publication of the final results of the next administrative review.

50 Fed.Reg. at 27479.

rate less than 0.50 percent to be *de minimis*. For all other firms, we determine the bounty or grant during the review period to be 3.50 percent *ad valorem*. *Id.* at 51737.[3]

The ITA had given interested parties opportunity to comment on the preliminary results before publishing the notice of the final results of the first 751 review. One of the interested party firms, not a party to the present action, contended in its comments that the ITA should revoke the order pursuant to the provisions of section 303 of the Act, as amended, 19 U.S.C. § 1303. Section 1303 prohibits the ITA "from assessing countervailing duties on duty-free products without an affirmative finding of injury if the United States has an international obligation to provide such an injury test." 50 Fed.Reg. at 51736. The petitioner argued the Understanding, granting Mexico most-favored-nation (MFN) status, established Mexico and the United States had an international obligation that duty-free goods from Mexico would be afforded an injury test before countervailing duties would be assessed. An interested party to the proceedings argued the Understanding "requires an injury test in all then pending and subsequent investigations. It does not preclude injury tests for pre-existing countervailing duty orders." *Id.*

The ITA disagreed with these contentions. The ITA responded, in the published final results, there were:

no international obligations within the meaning of section 303 of the Tariff Act to provide an injury test in this case. The Understanding specifically limits injury tests in countervailing duty proceedings to investigations in progress on April 23, 1985 and to proceedings begun on or after that date.

With regard to paragraph 5, we have confirmed with the U.S. negotiators that their intention was to exclude application of this Understanding to pre-existing orders. Inasmuch as the Mexican government has not commented on our preliminary results (in which we proposed to assess duties) nor exercised its rights under the disputes clause of the Understanding (paragraph 11), we have no reason to believe that the Mexican government has a different view.

*Id.*

Subsequently, in January of 1986, the final results of the first 751 review were challenged by plaintiff in *Cementos Anahuac del Golfo, S.A. v. United States*, Court No. 86–01–00082. The plaintiff in that action argued the Understanding between Mexico and the United States required the ITA to revoke the CVD order on PHC from Mexico. *See Cementos Anahuac del Golfo, S.A. v. United States*, Slip Op. 88–58 (May 12, 1988).

On August 24, 1986, Mexico became a formal contracting party of, and acceded to, the General Agreement on Tariffs and Trade (GATT)[4].

The ITA's preliminary results of the second administrative 751 review of the CVD order were published on September 29, 1986. *Portland Hydraulic Cement and Cement Clinker From Mexico; Preliminary Results of Countervailing Duty Ad-*

---

**3.** The ITA continued to inform and direct Customs as to procedure on the shipments. The published notice provided:

We will instruct the Customs Service to assess no countervailing duties on shipments of this merchandise from the five firms with zero or *de minimis* rates of subsidy, and countervailing duties of 3.50 percent of the f.o.b. invoice price on shipments from all other firms entered or withdrawn from warehouse, for consumption on or after July 8, 1983, and exported on or before December 31, 1983.

The Department will instruct the Customs Service not to collect cash deposits of estimated countervailing duties, as provided by section 751(a)(1) of the Tariff Act, on shipments

from the five firms with zero or *de minimis* assessment rates during the period of review or from Nacional and to collect cash deposits of estimated countervailing duties of 3.28 percent *ad valorem* for shipments from all other firms entered, or withdrawn from warehouse, for consumption on or after the date of publication of this notice. This deposit requirement and waiver shall remain in effect until publication of the final results of the next administrative review.

50 Fed.Reg. at 51737.

**4.** General Agreement on Tariffs and Trade (GATT), 30 October 1947, 61 Stat. T.I.A.S. No. 1700, 55 U.N.T.S. 184 (1947).

*ministrative Review,* 51 Fed.Reg. 34483 (1986). The review covered the period January 1, 1984 through December 31, 1984. As a result of its review, the ITA preliminarily determined *de minimis* bounty or grant rates existed for three Mexican firms, including plaintiff, and a bounty or grant rate of 3.35 percent *ad valorem* existed for all other firms. The ITA stated its intention to instruct Customs on the assessment of duty cash deposits.[5]

On October 29, 1986, during the comment period, plaintiff submitted comments to the ITA regarding the preliminary results of the second 751 review. Document No. 40 of the Administrative Record of the Second Administrative Review, *Portland Hydraulic Cement From Mexico,* Case No. C–201–013 (A.R.). Plaintiff contended the ITA had no authority to continue to impose countervailing duties on the subject merchandise because of the Understanding and Mexico's GATT accession. Plaintiff asserted these events were "changed circumstances" under 19 U.S.C. § 1675(b)(1) and were sufficient to request the ITA to revoke the outstanding CVD order.[6]

The ITA completed its second 751 review and published the results on December 10, 1986. *Portland Hydraulic Cement and Cement Clinker From Mexico; Final Results of Countervailing Duty Administrative Review,* 51 Fed.Reg. 44500 (1986). The petitioners' comment regarding revocation of the original countervailing duty order and the ITA's response to this comment provided as follows:

*Comment 1:* The five exporters contends [sic] that the Department should revoke this order. Section 303 of the Tariff Act prohibits the Department from assessing countervailing duties on duty-free products without an affirmative finding of injury if the United States has an international obligation to provide such an injury test. In the "Understanding Between the United States and Mexico Regarding Subsidies and Countervailing Duties" ("the Understanding") signed on April 23, 1985, the United States granted Mexico most-favored-nation ("MFN") status. On August 24, 1986, Mexico acceded to the General Agreement on Tariffs and Trade ("GATT"). Both the MFN status and the GATT membership constitute inter-

---

5. The notice set forth:

The Department intends to instruct the Customs Service not to assess countervailing duties on shipments of Mexican portland hydraulic cement and cement clinker from the three firms with zero or *de minimis* benefits, and to assess countervailing duties of 3.35 percent of the f.o.b. invoice price on shipments from all other firms exported on or after January 1, 1984 and on or before December 31, 1984.

The increase in the FOMEX interest rates reduces the total estimated bounty or grant to 3.20 percent *ad valorem*. Therefore, the Department intends to instruct the Customs Service not to collect a cash deposit of estimated countervailing duties, as provided by section 751(a)(1) of the Tariff Act, on shipments from Cementos Anahuac, S.A., Cementos Maya, S.A., and Cementos Mexicanos, S.A., and to collect 3.20 percent of the f.o.b. invoice price on shipments from all other firms entered, or withdrawn from warehouse, for consumption on or after the date of publication of the final results of this administrative review. These deposit requirements and waiver shall remain in effect until publication of the final results of the next administrative review.

51 Fed.Reg. at 34486.

6. Plaintiff petitioned the ITA to revoke the CVD order for the following specific reasons:

The ITA no longer has any authority to impose CVD's without an injury determination by the ITC on imports from Mexico, a "country under the Agreement" within the meaning of § 701(b)(2) of the Tariff Act of 1930, 19 U.S.C. § 1671(b)(2);

the ITA also has no authority to impose CVD's on Mexican cement, a duty-free product, without the injury test required by the United States "international obligations" within the meaning of section 303(a)(2) of the Tariff Act of 1930, 19 U.S.C. § 1303(a)(2); and

"changed circumstances" within the meaning of 19 U.S.C. § 1675(b)(i) occurred during the previous annual review as a result of a bilateral trade agreement between the U.S. and Mexico. These "changed circumstances" mandate that the ITA should have revoked the Order since the agency can no longer lawfully impose CVD's upon Mexican cement without the benefit of the ITC injury investigation. A.R. Document No. 40 at 2.

The plaintiff also raised additional similar grounds for requiring the ITA to revoke the CVD order based on the fact of Mexico's accession to the GATT on August 24, 1986. A.R. Document No. 40 at 3.

national obligations of the United States, as defined in section 303. The Department cannot continue to impose countervailing duties on Mexican exports of duty-free products without an affirmative injury determination, which is required by both Article VI.6.(a) of the GATT and section 303 of the Tariff Act.

*Department's Position:* We believe that we lack the authority to revoke this countervailing duty order on the basis of the Understanding. We confirmed with the principal U.S. negotiators that the intent of Article 5 of the Understanding was to exclude from the application of the Understanding, and hence the application of "country under the Agreement" status, [sic] order existing before April 23, 1985. *See,* final results of countervailing duty administrative review on certain iron-metal construction castings from Mexico (51 FR 9698, March 20, 1986).

We are currently considering whether Mexico's accession to the GATT affects our authority to assess countervailing duties on Mexican duty-free products without an affirmative injury determination from the International Trade Commission. Since Mexico's accession was effective on August 24, 1986, our decision will not affect entries covered by this review, which extends only through December 31, 1984.

51 Fed.Reg. at 44500–01. The additional allegations regarding the calculation of the FOMEX loans were treated as follows:

*Comment 5:* Anahuac del Golfo claims that the Department miscalculated the preferential rate on FOMEX export loans. Because the interest on these loans is prepaid, the effective preferential rate is higher than the nominal rate.

*Department's Position:* We lack sufficient information to measure an effective dollar benchmark in 1984. The Federal Reserve did not publish data on effective interest rates until 1985. Therefore, we can only compare a nominal interest rate benchmark to a nominal preferential interest rate in 1984. However, we now believe that we have suffi-

cient information to measure benefits using effective interest rates for dollar-denominated loans from 1985 and for peso-denominated loans from 1982.

To determine the effective interest rate benchmark for the estimated duty deposit rate for dollar loans, we used the weighted-average annual effective interest rates published in the Federal Reserve Bulletin in the second quarter of 1986, the most recent information available. These weighted-average effective interest rates are based on data, for fixed rate loans under one million dollars, received from a survey of gross loan extensions made by various banks during one week of each quarter. The effective rates include the various terms of the loans in addition to the interest rate. On FOMEX export (dollar) loans the interest is prepaid. Since we have no evidence of any charges on these loans other than interest, we calculated the effective interest rate by using the nominal rate and taking into account the cost of prepayment of interest.

For peso-denominated loans, the Banco de Mexico ("the Bank") publishes in its *Indicadores Economicos* ("I.E.") both nominal and effective interest rates. Using data received from a sample of Mexican banks, the Bank bases the nominal I.E. rates on the Costo Porcentual Promedio ("CCP"), the average cost of funds to those banks, plus a spread that reflects a risk premium. The effective I.E. interest rates are based on data received from a sample of companies representing a cross-section of the economy.

These effective rates include finance charges, *e.g.,* commissions, fees for opening a line of credit, fees for credit renewal, prepayment of interest, compensating balances, etc., and may also include compounding of interest, since many of the loans included in the Bank's sample have short (2–3 month) terms. Both the nominal and effective I.E. interest rates are weighted averages of the rates reported to the Bank by the banks and companies in the respective samples.

To determine the effective interest rate benchmark for 1984 peso loans, we used the I.E. effective rates published each month and calculated an average annual effective rate. In 1985, the Bank stopped publishing the I.E. rates. Therefore, we calculated the average spread between the CCP rate and the I.E. effective interest rates for the period 1982 through 1984, the only period for which we have I.E. rates. Our effective interest rate benchamrk [sic] for purposes of the estimated duty deposit rate was the sum of this average spread and the most recent CPP rate available. For the FOMEX pre-export loans, we found no evidence of finance charges of any kind. Since interest on these loans is paid at the end of the term, we consider the nominal preferential rate to be the same as the effective preferential interest rate.

By using effective interest rates to the extent possible and making the adjustments noted in Comments 2, 3, and 4, we now find the 1984 benefit FOMEX loans to be 1.83 percent *ad valorem* and the current benefit, for purposes of cash deposits, to be 1.65 percent *ad valorem.*

*Comment 6:* the [sic] Anahuac Group contends that the Department inappropriately used the Federal Reserve Board weighted-average interest rate as a benchmark in calculating the benefit from the FOMEX export loans. Instead, the Department should use published interbank rates ("aceptaciones bancarias") because the interest rate for preferred borrowers such as Anahuac del Golfo was based in 1984 on these interbank rates.

*Department's Position:* We disagree. The interest rates published by the Federal Reserve are derived from average rates paid by commercial borrowers. The rates that the Anahuac Group proposes are interbank rates for dollar loans, not average commercial lending rates. Although the interbank rate may be closer to the actual borrowing experience of Anahuac del Golfo, we are interested in establishing a national average benchmark rate, not a company-specific one.

51 Fed.Reg. at 44501–02.

The ITA also responded to plaintiff's complaint about the company-specific/country-wide countervailing duty rate discrepancy, as follows:

*Comment 10:* The Anahuac Group reasserts its position set out in the previous review that the Department must calculate company-specific countervailing duty rates in this case. There is nothing in the record to support the view that, in this case, the Department's burden is lessened by calculating a country-wide rate, which is itself derived from a weighted-average rate using the separate company rates. The Anahuac Group also maintains that section 303 of the Tariff Act requires the Department to collect duties that match *ad valorem* benefits actually received by a producer or exporter. The Department's decision in this review is governed by its final determination in this case, in which the Department found the spread of rates to be materially different.

Cementos de Chihauhua [sic], on the other hand, maintains that a country-wide rate is appropriate and consistent with the international obligations of the United States, the countervailing duty statute, current and purposed [sic] Commerce regulations, and past practice.

*Department's Position:* We disagree with Anahuac's views. We addressed this issue at length in the final results of our last review. We have once again found that, other than the one firm with zero benefits and the two firms with *de minimis* benefits, the rates applicable to individual firms are not "significantly different" from the weighted-average rate.

*Id.* at 44502.[7]

The ITA, in the final published results of the second 751, determined a zero or *de minimis* bounty or grant rate existed on

---

**7.** Plaintiff raised this issue in its challenge of the first 751 review of the CVD order covering Mexican PHC. *Cementos Anahuac,* —— CIT ——, 687 F.Supp. 1558.

the PHC entered by plaintiff, Cementos Maya, and Cementos Mexicanos from January 1, 1984 through December 31, 1984. The ITA also determined a 3.32 percent *ad valorem* rate existed for all other firms. The ITA directed Customs to continue to "assess no countervailing duties on shipments of this merchandise from the three firms with zero or *de minimis* rates and to assess countervailing duties of 3.32 percent of the f.o.b. invoice price shipments from all other firms...." *Id.* at 44503.

On December 16, 1986, plaintiff filed this action challenging the final second 751 review results published on December 10, 1986.

On July 1, 1987, plaintiff filed a Rule 56.1 motion. This motion is presently before the Court.

On November 6, 1987, upon consent of all parties challenging the second 751 review, the Court enjoined Customs and the ITA from liquidating the entries of PHC exported from Mexico during the year 1984, the time period covered by the final second 751 review results as published in the Federal Register on December 10, 1986. *See* 51 Fed.Reg. 44500.

## BACKGROUND

Since much of plaintiff's action rests on the application of the United States countervailing duty and international trade agreements, it is instructive to consider the relevant statutes and their historical development in relation to United States trade treaties.

An early codification of the countervailing duty law is embodied in the Tariff Act of 1890, which, *inter alia*, provided domestic sugar refiners protection from unfair foreign competition. This protection consisted of countervailing duties imposed on refined sugar imported from countries that directly or indirectly paid bounties on refined sugar. Tariff Act of 1890, ch. 1244, ¶ 237, 26 Stat. 567, 584 (1890).[8]

It was § 5 of the Tariff Act of 1897, though, that applied the countervailing duty law to all imported products.[9] This provision was reenacted over the years by Congress without substantial change. *See* Tariff Act of 1909, § 6, 36 Stat. 85; Tariff Act of 1913, § IV(E), 38 Stat. 193; Tariff Act of 1922, § 303, 42 Stat. 935; Tariff Act of 1930, § 303, 46 Stat. 687; Trade Act of 1974, § 331(a), 88 Stat. 2049, 19 U.S.C. § 1303.

The General Agreement on Tariffs and Trade, otherwise known as the GATT,[10] has had a significant effect on the development of the United States countervailing duty law. The GATT is an international treaty that entered into force on October 30, 1947. It was the result of tariff negotiations among twenty-three governments including the United States. The United States applies this agreement pursuant to the Protocol of Provisional Application, 55 U.N.T.S. 308 (1947) (Protocol). The Protocol provides that signatories, including the United

---

**8.** The coverage of these provisions was expanded in 1894 to cover all imported sugar, new and refined. Tariff Act of 1894, ch. 349, ¶ 182½, 28 Stat. 509, 521 (1894).

**9.** Section 5 provides as follows:

That whenever any country, dependency, or colony shall pay or bestow, directly or indirectly, any bounty or grant upon the exportation of any article or merchandise from such country, dependency, or colony, and such article or merchandise is dutiable under the provisions of this Act, then upon the importation of any such article or merchandise into the United States, whether the same shall be imported directly from the country of production or otherwise, and whether such article or merchandise is imported in the same condition as when exported from the country of production or has been changed in condition

by remanufacture or otherwise, there shall be levied and paid, in all such cases, in addition to the duties otherwise imposed by this Act, an additional duty equal to the net amount of such bounty or grant, however the same be paid or bestowed. The net amount of all such bounties or grants shall be from time to time ascertained, determined, and declared by the Secretary of the Treasury, who shall make all needful regulations for the identification of such articles and merchandise and for the assessment and collection of such additional duties.

Tariff Act of 1897, ch. 11, § 5. 30 Stat. 151, 205 (1897).

**10.** General Agreement on Tariffs and Trade, 61 Stat. A3, T.I.A.S. No. 1700, 55 U.N.T.S. 182 (1947).

States, undertake to apply provisionally (on or after January 1, 1948) the following: "(a) Parts I and III of the [GATT], and (b) Part II of that Agreement to the fullest extent not inconsistent with existing legislation." *Id.* Clause (b) has been commonly known as the "grandfather clause" because it allows the United States, as well as other countries, to retain, in force *inter alia*, any pre-existing countervailing duty laws and legislation that was inconsistent with GATT.

Part II of the GATT includes Article VI which deals with the area of antidumping and countervailing duties. Paragraph 6(a) of Article VI provides:

6. (a) No contracting party shall levy any antidumping or countervailing duty on the importation of any product of the territory of another contracting party unless it determines that the effect of the dumping or subsidization, as the case may be, is such as to cause or threaten material injury to an established domestic industry, or is such as to retard materially the establishment of a domestic industry.

GATT, 61 Stat.All, T.I.A.S. No. 1700, 55 U.N.T.S. 184 (1947).[11]

At the time of the establishment of the GATT in 1947, the United States countervailing duty law, under § 303 of the Tariff Act of 1930, only applied to dutiable items and did not provide for an injury determination. Therefore, under the "grandfather clause" of the GATT, the United States was under no obligation to apply paragraph 6(a) of the GATT to situations which were inconsistent with U.S. trade law.

In 1974, Congress passed the Trade Act of 1974, which, *inter alia*, amended § 303

of the trade laws, expanding the countervailing duty law to cover non-dutiable as well as dutiable items.[12] Section 303 originally contained the old law that allowed countervailing . duties to be assessed on only dutiable items. The 1974 amendment added, *inter alia*, subsection (a)(2) which provided as follows:

(2) In the case of any imported article or merchandise which is free of duty, duties may be imposed under this section only if there is an affirmative determination by the Commission under subsection (b)(1) of this section; except that such a determination shall not be required unless a determination of injury is required by the international obligations of the United States.

19 U.S.C. § 1303(a)(2) (1976).

The legislative history explains the reasons behind these amendments:

4. *Injury Test—Duty Free Merchandise.*—The Committee agreed with the provision of the House bill extending the application of the countervailing duty law to duty-free articles. Under this provision, no additional duty could be imposed with respect to any duty-free article unless there is a determination by the International Trade Commission ... that a domestic producer of like or directly competitive articles is being or is likely to be injured, or is prevented from being established by reason of importation of such article.

The inclusion of an injury standard is appropriate in light of the general countervailing duty rule in Article VI of the GATT which requires a finding of injury before such duties may be levied on subsidized product imports. Section 303 of

**11.** As amended and restated by Part D of the Protocol Amending the Preamble and Parts II and III of GATT. 8 UST 1769 (Oct. 7, 1957).

**12.** The following amendments were made to § 303 of the Tariff Act of 1930:
[For] Subsec[tion] (a), [the Trade Act of 1974] designated existing provisions as par. (1), added pars. (2) to (6), and in par. (1) as so designated, struck out "and such article or merchandise is dutiable under the provisions of this chapter," preceding "then upon the importation of any such article or merchandise" and struck out provisions directing the

Secretary of the Treasury to ascertain, determine, or estimate, from time to time, the net amount of bounties or grants, declare the net amount so determined or estimated, and make all regulations he deems necessary for the identification of the articles and merchandise and for the assessment and collection of the additional duties.
[For] subsec[tion] (b) to (e) [, the Trade Act] added subsecs. (b) to (e).
The Trade Act of 1974, § 331(a), 19 U.S.C. § 1303 note on amendments (1976).

the 1930 Tariff Act does not provide for an injury test. However, because the present U.S. countervailing duty law, which only applies to dutiable items, predates the GATT, it is within the permitted exceptions to the GATT under the so-called "grandfather clause". However, the extension of such law to nondutiable items is not covered by any such exception and so the nondutiable items should be subject to an injury test.

S.Rep. No. 1298, 93 Cong., 2d Sess. 185, *reprinted in* 1974 U.S. Code Cong. & Admin. News 7186, 7320.

Therefore, following the enactment of the Trade Act of 1974, injury determinations by the International Trade Commission (ITC) were required as a condition precedent to the imposition of countervailing duties on subsidized nondutiable goods only if required by international obligations (*i.e.*, the GATT). An injury test was still not required for dutiable goods.

In 1979, Congress enacted the Trade Agreements Act of 1979, Pub.L. 96–39, 93 Stat. 144, which added a new title to the Tariff Act of 1930, Title VII, Countervailing and Antidumping Duties, 19 U.S.C. 1671 through 1677g. The Trade Agreements Act was the implementing legislation for the Subsidies/Countervailing Measures Agreement (Subsidies Code), signed by GATT members, stemming from the Tokyo Round of trade negotiations of the GATT.[13] Section 101 of the Trade Agreements Act added § 701 to the Tariff Act of 1930, 19 U.S.C. § 1671, which replaced the countervailing duty law under 19 U.S.C. § 1303 as applied to exports from a "country under the Agreement. The term "under the Agreement" refers to the obligations found in the Subsidies Code of the GATT agreement. Section 1671 provides as follows:

§ 1671. Countervailing duties imposed

(a) General Rule

If—

(1) the administering authority determines that—

(A) a country under the Agreement, or

(B) a person who is a citizen or national of such a country, or a corporation, association, or other organization organized in such a country,

is providing, directly or indirectly, a subsidy with respect to the manufacture, production, or exportation of a class or kind of merchandise imported into the United States, and

(2) the Commission determines that—

(A) an industry in the United States—

(i) is materially injured, or

(ii) is threatened with material injury, or

(B) the establishment of an industry in the United States is materially retarded,

by reason of imports of that merchandise,

then there shall be imposed upon such merchandise a countervailing duty, in addition to any other duty imposed, equal to the amount of the net subsidy.

(b) Country under the Agreement

For purposes of this part, the term "country under the Agreement" means a country—

(1) between the United States and which the Agreement on Subsidies and Countervailing Measures applies, as determined under section 2503(b) of this title.

(2) which has assumed obligations with respect to the United States which are substantially equivalent to obligations under the Agreement, as determined by the President, or

(3) with respect to which the President determines that—

(A) there is an agreement in effect between the United States and that country which—

(i) was in force on June 19, 1979, and

(ii) requires unconditional most-favored-nation treatment with respect to articles imported into the United States,

13. The Tokyo Round of Multinational Trade Negotiations was conducted from 1973 to 1979.

(B) the General Agreement on Tariffs and Trade does not apply between the United States and that country, and

(C) the agreement described in subparagraph (A) does not expressly permit—

(i) actions required or permitted by the General Agreement on Tariffs and Trade, or required by the Congress, or

(ii) non-discriminatory prohibitions or restrictions on importation which are designed to prevent deceptive or unfair practices.

(c) Cross reference

For provisions of law applicable in the case of merchandise which is the product of a country other than a country under the Agreement, see section 1303 of this title.

19 U.S.C. § 1671 (1982).

The legislative history explains the "new" law and its effect on the "old" countervailing duty law:

*Present law.—*

\* \* \* \* \* \*

Section 303 generally does not require that imports benefiting from a bounty or grant injure a domestic industry before a countervailing duty is imposed. However, if the international obligations of the United States require that duty-free articles from a particular country injure a domestic industry before a countervailing duty may be imposed, then section 303(a)(2) requires a determination whether a domestic industry is being or is likely to be injured or is prevented from being established, by reason of the importation of the article or merchandise benefiting from the bounty or grant.

\* \* \* \* \* \*

*The bill.*—The bill would leave section 303(a)(1) and (2) of the Tariff Act in effect. Section 303 would apply to all imports other than those to which new section 701 of the Tariff Act of 1930 ... applies....

Under section 701 of the Tariff Act ... a countervailing duty would be imposed on a class or kind of merchandise imported into the United States if—

(1) a country to which the United States accords the benefits of the Agreement on Subsidies and Countervailing Measures, or

(2) a person, who is a citizen or national of such country, or an organization organized in such a country,

is providing, directly or indirectly, a subsidy with respect to the manufacture, production, or exportation of that merchandise. No countervailing duty could be imposed under section 701 unless a domestic industry is materially injured or threatened with material injury, or the establishment of an industry in the United States is materially retarded, by reason of imports of the class or kind of merchandise with respect to which a subsidy is being provided.

\* \* \* \* \* \*

*Reason for the provision.*—Section 701 would establish the conditions for imposition of countervailing duties consistent with the agreement. A domestic industry must be materially injured by reason of subsidized imports before a countervailing duty could be imposed.

Section 701 would apply only to the extent (1) required by the agreement, as determined under section 2(b) of the bill, and (2) provided under section 701(b)(2) and (3). In all other cases, section 303 of the Tariff Act of 1930, as amended under section 103 of the bill, would continue to apply. Section 303 would continue to require injury as a condition for imposition of countervailing duties only on duty-free imports and only if the international obligations of the United States so require.

Selective application of section 701 is intended to encourage countries to assume the obligations of the agreement, or substantially equivalent obligations, with respect to the United States. This application is consistent with the agreement and the GATT, including the Protocol of Provisional Application of the General Agreement on Tariffs and Trade.

\* \* \* \* \* \*

*Present law.*—Section 303 of the Tariff Act (19 U.S.C. 1303) contains few procedural provisions.... The ITC injury determination is required ... only with respect to duty-free goods and only to the extent required by the international obligations of the United States. The United States is obligated to apply the injury test under section 303 only with respect to duty-free products of countries which have fully acceded to the General Agreement on Tariffs and Trade.

*The bill.* The amendment ... would exclude from the coverage of section 303 of the Tariff Act articles which are the product of a country under the agreement within the meaning of section 701(b) of the Tariff Act, *i.e.*, articles to which section 701 of the Tariff Act would apply.

\*    \*    \*    \*    \*    \*

*Reasons for the provision.*—The amendments ... conform section 303 ... to appropriate provisions of title VII of the Tariff Act.... Section 303(a)(1) and (2) of the Tariff Act will continue in effect with respect to articles not subject to section 701 of that act. Section 303 will continue to impose countervailing duties, without an injury determination, on all dutiable and certain duty-free articles with respect to which bounties or grants are being provided. The President's statement of proposed administrative action erroneously asserts that an injury determination, will be required before countervailing duties can be imposed on duty-free articles from any country. Duty-free articles from certain countries will be subject to countervailing duties after an injury determination, but only if international obligations of the United States, other than the Agreement on Subsidies and Countervailing Measures, require that determination with respect to products of those countries.

S.Rep. No. 96–249, 96th Cong., 1st Sess. 43–45 and 103, *reprinted in* 1979 U.S. Code Cong. & Admin. News 381, 429–31 and 489 (footnote omitted).

Section 1303 was amended by the Trade Agreements Act of 1979 by changing the language in (a)(2) and adding new language in (b). These changes are shown as follows:

(2) In the case of any imported article or merchandise which is free of duty, duties may be imposed under this section only if there are affirmative determinations by the Commission under subtitle IV of this chapter; except that such a determination shall not be required unless a determination of injury is required by the international obligations of the United States.

(b) Regulations prescribed by administering authority; imported articles or merchandise which are not duty free

The duty imposed under subsection (a) of this section shall be imposed, under regulations prescribed by the administering authority (as defined in section 1677(1) of this title), in accordance with subtitle IV of this chapter (relating to the imposition of countervailing duties) except that, in the case of any imported article or merchandise which is not free of duty—

(1) no determination by the United States International Trade Commission under section 1671b(a), 1671c, or 1671(b) of this title shall be required,

(2) an investigation may not be suspended under section 1671c(c) of this title,

(3) no determination as to the presence of critical circumstances shall be made under section 1671b(e) or 1671d(a)(2) or (b)(4)(A) of this title, and

(4) any reference to determinations by the Commission, or to the suspension of an investigation under section 1671c(c) of this title which are not permitted or required by this subsection shall be disregarded.

19 U.S.C. § 1303(a)(2) and (b) (1982).

It appears, from the language of the statute and from the legislative history, that § 701 of the Tariff Act of 1930 as amended by the Trade Agreements Act of 1979 § 101, 19 U.S.C. § 1671 became the controlling countervailing duty law for

countries under the Agreement and § 303, 19 U.S.C. § 1303, became applicable as a residual provision covering situations that did not apply under § 701, *i.e.*, situations involving countries not under the Agreement.

The Trade Agreements Act of 1979, in part, amended the U.S. trade laws to include, *inter alia,* an injury test for dutiable goods imported from a country under the GATT or from a country the United States recognizes as one that has assumed obligations substantially equivalent to those found in the GATT. Dutiable goods not covered under Title VII of the 1979 Act were still subject to countervailing duties without an injury determination.

It appears from the language, therefore, dutiable and nondutiable merchandise subject to bounties or grants from countries or entities not "under the Agreement" and not under certain international obligations with the United States are subject to countervailing duty imposition without an injury determination.

### DISCUSSION

Plaintiff's main contention concerns the authority of the ITA to impose countervailing duties on PHC without an ITC injury finding in the second 751 review covering imports entered in 1984. Specifically, plaintiff argues the Understanding and Mexico's accession to the GATT under United States countervailing duty law require an injury determination by the ITC before the ITA may impose countervailing duties on the subject non-dutiable goods. Plaintiff also contends Mexico's status under these two agreements constitutes a changed circumstance warranting revocation of the outstanding CVD order. Plaintiff urges the ITA's refusal to revoke the CVD order was contrary to law.

Plaintiff further contends the ITA's decision to use a single "country-wide" weighted-average CVD rate in the second 751 review covering 1984 imports of PHC, in contradiction to its previous use of "company-specific" rates in the original CVD final determination, was unsupported by substantial evidence and was otherwise contrary to law.

Plaintiff also argues the ITA's methodology in using a nominal rate, and not the actual effective interest rate, in comparison to a nominal benchmark rate for purposes of calculating alleged subsidies received from short-term FOMEX loans, was unreasonable.

Defendant contends the question of whether or not the ITA should have revoked the outstanding CVD order is not properly before the Court for review. Defendant contends plaintiff's action challenging the final results of the second 751 review must be restricted to challenging the factual findings and legal conclusions underlying those results pursuant to 19 U.S.C. § 1516a(a)(2). The final results, defendant maintains, were not based upon the ITA's decision about the request for revocation because the ITA is still considering the request. Therefore, defendant concludes, the revocation question should be properly raised at a later date, if at any time, when the ITA has decided the issue.

Defendant additionally claims the ITA properly decided that the PHC entered in 1984 was subject to the imposition of countervailing duties without an injury determination. Defendant argues no international obligations or GATT entitlements for Mexico were in existence when the subject merchandise was imported into the United States in 1984. Therefore, concludes defendant, the ITA had authority to impose countervailing duties on the entries without first requiring an injury determination from the ITC.

Defendant stresses the ITA's methodologies involving country-wide rates and calculations of FOMEX loan benefits were lawful and substantiated by evidence on the record.

Initially the Court must decide if it can properly examine the question of whether the ITA should have revoked the outstanding CVD order on PHC from Mexico. Plaintiff maintains, in light of the Understanding and on account of the accession of Mexico to the GATT, the ITA had no authority to impose duties on the goods and

therefore the CVD order should have been revoked.

Defendant, on the other hand, contends the revocation of the CVD order is not properly before this Court since this is a civil action, pursuant to 19 U.S.C. § 1516a, challenging the final results of an administrative review of an outstanding CVD order by the ITA. Defendant urges that the Court's jurisdiction is limited by the provisions of 28 U.S.C. § 1581(c), pursuant to which the Court can review only the amount of the countervailing duty which the ITA calculated during the review and the factual findings and legal conclusions which underlie that determination. Defendant contends that since the ITA has not yet decided the revocation question, a challenge pertaining to revocation should be made when the question has been ultimately resolved.

As provided above, the ITA responded to the petitioner's request for revocation of the CVD order in pertinent part as follows:

*Department's position:* We believe that we lack the authority to revoke this [CVD] order on the basis of the Understanding. We confirmed ... the intent of ... the Understanding was to exclude ... order [sic] existing before April 23, 1985....

We are currently considering whether Mexico's accession to the GATT affects our authority to assess countervailing duties on Mexican duty-free products without an affirmative injury determination from the [ITC]. Since Mexico's accession was effective on August 24, 1986, our decision will not affect countries covered by this review, which extends only through December 31, 1984.

51 Fed.Reg. at 44501 (citation omitted).

Although the defendant contends the ITA has not made a decision on the revocation question, it is clear from the language of the results that the ITA has made a decision not to revoke the order on the basis of the Understanding and has arrived at the legal conclusion that the "decision will not affect entries covered by this review, which extends only through December 31, 1984." *Id.* Furthermore, the results reveal the ITA directed the Customs Service to assess countervailing duties on certain goods covered by the review, clearly an action affecting the goods.

█ It is also clear plaintiff has properly brought its action under 19 U.S.C. § 1516a(a)(2) challenging the factual findings and legal conclusions underlying the final results. The ITA has arrived at the legal conclusions that the Understanding does not affect the ITA's authority to maintain the CVD order and the Mexico GATT accession does not affect goods covered in the review. These conclusions, in response to petitioners' request for a revocation, are integral to the ITA's decision to assess countervailing duties, and as such, comprise an appealable basis for review.

Defendant's argument the revocation question is not reviewable by this Court does have merit, but only insofar as it pertains to that portion of the CVD order covering goods entered after the date of the accession of Mexico to the GATT, that is, August 24, 1986. *See Cementos Guadalajara, S.A. v. United States,* — CIT —, —, 686 F.Supp. at 353, — – — (1988), *appeal docketed,* No. 88–1400 (Fed. Cir. May 4, 1988). The ITA has reserved decision as to what effect the accession will have on the ITA's authority to assess countervailing duties on entries after 1984 and, therefore, whether or not the outstanding CVD order should be revoked as to those entries. In the interim, the ITA is directing Customs to collect countervailing duties on those goods covered under the second 751 reviews; only estimated duties will be imposed by Customs on all other goods entered after this date.

The 751 review results covering those goods entered after the GATT accession have not yet been published. Once the 751 review results on these goods and the decision to revoke the order are published, then plaintiff can properly challenge the final determination concerning those goods. *See id.;* 19 U.S.C. § 1675(c); 19 C.F.R. § 355.42.

Plaintiff's main contention in this action is the ITA failed to revoke its CVD order on PHC from Mexico and continued to im-

pose countervailing duties on the merchandise without an affirmative finding of injury by the ITC as required by statute and international obligations. Plaintiff has advanced several arguments in support of its contention. Plaintiff urges the Court to find that the ITA's final results of its second 751 review of the CVD order concerning PHC are unsupported by substantial evidence on the record or are otherwise not in accordance with law.

Plaintiff asserts that Mexico is a "country under the Agreement" pursuant to the Understanding given effect between the United States and Mexico on April 23, 1985. Because Mexico has attained this status,[14] continues plaintiff, the ITC must make an affirmative injury determination before it may impose and assess countervailing duties on the Mexican PHC pursuant to § 701(a) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1671(a). According to the plaintiff, this entitlement was bestowed on the effective date of the Understanding but was retrospectively applicable to all PHC merchandise under an "investigation in progress."

Plaintiff maintains the Understanding makes clear the United States is obligated not to impose countervailing duties without an injury determination " 'with respect to all United States countervailing duty investigations in progress as of the date of entry into force of this Understanding....' " Plaintiff's Memorandum in Support of its Motion for Judgment Upon the Agency Record, *Cementos Anahuac del Golfo, S.A. v. United States*, Court No. 86–12–01607 at 19 (quoting the Understanding at ¶ 5). Plaintiff urges the phrase "investigations in progress" should be interpreted to include proceedings in annual 751 reviews as well as proceedings in pre-CVD order

investigations. Because the second 751 review covering the PHC entered in 1984 had not been completed at the time the Understanding was signed, plaintiff maintains this review and the underlying CVD order should have been revoked when no affirmative injury determination was made during this "investigation" that was in progress.[15]

Defendant, while not disputing plaintiff's assertion the Understanding conveyed upon Mexico "country under Agreement" status, challenges the notion that an injury determination was necessary before the ITA could assess countervailing duties on the PHC entered in 1984. Defendant claims there were no international obligations requiring an injury determination in existance at the time the subject PHC entered into the United States. Defendant criticizes the plaintiff's interpretation of the term "investigations in progress" as conflicting with the intent of the negotiators of the Understanding and the ITA's regulations. Defendant claims "investigations in progress" refers only to inquiries made prior to the publication of a CVD order.

The Court notes the Executive Branch of the United States Government, through the United States Trade Representative's Office, published a formal declaration that, as of April 23, 1985, the effective date of the Understanding, pursuant to 19 U.S.C. § 1671(b), Mexico is a "country under the Agreement." *Determination Regarding the Application of Certain International Agreements*, 50 Fed.Reg. 18335 (1985). This declaration is embodied in paragraph 14 of the Understanding. This would necessarily result in Mexico receiving the same treatment under the United States trade laws pursuant to § 1671(b) as any

---

**14.** Plaintiff asserts 19 U.S.C. § 1671(b) identifies a "country under the Agreement" as "one which has assumed obligations with respect to the United States which are substantially equivalent to obligations under the Agreement, as determined by the President." Due to the declaration of the United States President by the United States Trade Representative's Office, on April 30, 1985, that Mexico was a country under the Agreement, *Determination Regarding the Application of Certain International Agreements*, 50 Fed.Reg. 18335 (1985), plaintiff concludes that it

is clear that Mexico has attained the status of "a country under the Agreement."

**15.** Although plaintiff argues the ITA should have revoked the CVD order in the course of the *first* 751 review, plaintiff contends in a footnote that this argument is pending before the Court in a different action. *Cementos Anahuac del Golfo, S.A. v. United States*, Court No. 86–01–00082. The Court issued its decision on that action in —— CIT ——, 687 F.Supp. 1558, on May 12, 1988.

other country found to be "under the Agreement." Since GATT member countries and, in general, countries "under the Agreement" are afforded the same treatment under United States trade laws pursuant to § 1671(b), it would appear that the ITA's decision it lacked authority, pursuant to the Understanding, to revoke the CVD order covering PHC entered before April 23, 1985 was in accord with the decision it made pertaining to Mexico's accession to the GATT. Both the signing of the Understanding and the accession to the GATT would seem to affect the ITA's "authority to assess countervailing duties on Mexican duty-free products without an affirmative injury determination from the [ITC]," 51 Fed.Reg. at 44501, in the same manner. Neither agreement had provision for retroactive effect; *i.e.*, neither affected the 1984 PHC which was entered before the effective date of either agreement.

The Court's observation above (that § 1671(b) applies), though, does not provide a basis for validating plaintiff's argument concerning the requirement of an injury determination for the PHC entered in 1984. Plaintiff believes the key issue at stake is whether or not the language, "investigations in progress," embodied in the Understanding, should be interpreted to include 751 reviews. Although significant, this phrase should not be scrutinized without resort to the remainder of the language of paragraph 5. The Court therefore looks to the entire language of paragraph 5 of the Understanding.

Paragraph 5 provides "[w]ith respect to all United States *countervailing duty investigations in progress* ... the United States shall ensure that *no countervailing duties shall be imposed upon any product* of Mexico unless it is determined that the subsidized imports are ... causing or threatening to cause material injury...." *Understanding, supra*, at ¶ 5 (emphasis added). The central focus of the Court's interpretation of this sentence deals not

with the introductory prepositional phrase, but with the independent clause concerning the imposition of countervailing duties.

The Court has recognized that United States countervailing duty law provides for the imposition of duties on merchandise as it is entered even though the actual amount of duties due may not be finally assessed until a later time, including after possible successive 751 reviews. *Cementos Guadalajara*, at ——, 686 F.Supp. at 351–52.

■ While paragraph 5 of the Understanding contains distinct language concerning the imposition of duties and investigations in progress, the significance of paragraph 5 is to extend to Mexico status as a "country under the Agreement" [16] and thereby afford Mexican products the right to an injury determination under United States countervailing duty law as set forth in Title VII of the Tariff Act of 1930, 19 U.S.C. §§ 1671 through 1677g. This status and the corresponding statutory entitlements, however, did not become extant for Mexico and its goods until April 23, 1985, the effective date of the Understanding. The PHC from Mexico entered prior to this date was not entitled to the applicable injury determination under United States law. Because the PHC was entered prior to Mexico's recognition as a "country under the Agreement," the imposition of duties on those goods entered prior to April 23, 1985 was not subject to an affirmative injury determination before the final assessment and liquidation stage of the proceedings. *See generally Cementos Guadalajara*, —— CIT ——, 686 F.Supp. 335.

Plaintiff contends the second 751 review was an "investigation in progress" when the Understanding was signed and therefore no duties should have been assessed for PHC covered by that review without an affirmative injury determination. Plaintiff cites *Al Tech Specialty Steel Corp. v. United States*, 3 Fed.Cir. (T) 1, 745 F.2d 632 (Fed.Cir.1984), for support of its propo-

---

**16.** Mexico attained this status by assuming "obligations with respect to the United States which are substantially equivalent to obligations under the Agreement on the Interpretation and Application of Articles VI, XVI and XXIII of the

General Agreement on Tariffs and Trade." *Determination Regarding the Application of Certain International Agreements,* 50 Fed.Reg. 18335 (1985). *See* 19 U.S.C. § 1671(b)(2).

sition that a 751 review is an "investigation" for purposes of interpretation of paragraph 5 of the Understanding. Notwithstanding the Court's holding above, the Court will address these contentions to provide further support for the Court's decision.

As plaintiff recognizes in its reply brief, "*Al Tech* is not on all fours...." in holding that the word "investigations," for purposes of the Understanding, includes a 751 review. The pertinent issue in *Al Tech* involved the definition of the *phrase* "final determination in an investigation" as applicable to verification of information by the ITA as required by 19 U.S.C. § 1677e(a). The government appellant in *Al Tech* contended the lower court:

> erred in holding that [§ 1677e(a)] requires ... verification in section 751 periodic reviews.... [The Appellant] maintain[ed] that a "final determination in an investigation" occurs only in ... "the investigative phase" of an administrative antidumping or countervailing duty 'proceeding,' not in 'the assessment phase' of a proceeding in which section 751 period reviews occur."

*Al Tech*, 745 F.2d at 634.

The United States Court of Appeals for the Federal Circuit, in *Al Tech*, carefully limited the definitional analysis of the word "investigation" to the application of verification under § 1677e(a). The court found the word "investigation" as used throughout the statutes lacked a plain and consistent meaning. Nevertheless, the court held, pursuant to § 1677e(a), verification of information was required in both the investigative and assessment phases since the legislative history made evident to the court that "Congress intended no limitation on the verification requirement to the in-

vestigative phase of the inquiry." *Id.* at 640.

It is important to note Congress remedied the ambiguity, as noted by the *Al Tech* court, by amending § 1677e(a) in the Trade and Tariff Act of 1984. The relevant change enacted by Congress was legislation directing the agency to verify all information relied upon in: (1) a final determination in an investigation; (2) a revocation under section 1675(c); and (3) a review and determination under section 1675(a).[17] 19 U.S.C. § 1677e(a) (1985). Congress made a clear distinction between an "investigation" and a "751 review."

Defendant points out the ITA conferred with the United States officials, who helped to negotiate the Understanding, prior to publication of the first 751 review results. It appears from these conferences, the meaning ascribed to the term "investigations in progress" refers to that period of inquiry prior to the publication of a CVD order. *See* 50 Fed.Reg. at 51736 ("we have confirmed with U.S. negotiators that their intention was to exclude application of the Understanding to pre-existing orders").

Defendant cites an ITA memorandum from the Director of the ITA's Office of Policy, dated October 4, 1985, which provides as follows:

> You asked for my interpretation of the U.S.–Mexico Understanding Regarding Subsidies, which was signed on April 23, 1985. Specifically, you asked whether MFN [most favored nation] principles require that we revoke outstanding CVD orders unless an injury test is provided. The short answer is no. Although Mexico was designated as a "country under the Agreement" by virtue of the entry into force of the Understanding, the Understanding clearly provides that the injury test will not apply to proceedings

---

**17.** The original text of § 1677e(a) prior to the 1984 amendment provided as follows:

§ 1677e. Verification of Information

(a) General Rule

Except with respect to information the verification of which is waived under section 1673b(b)(2) of this title, the administering authority shall verify all information relied upon in making a final determination in an investigation. In publishing such a determi-

nation, the administering authority shall report the methods and procedures used to verify such information. If the administering authority is unable to verify the accuracy of the information submitted, it shall use the best information available to it as the basis for its determination, which may include the information submitted in support of the petition. 19 U.S.C. § 1677e(a) (1982).

in which CVD orders were issued prior to April 23, 1985. Under Article 5 of the Understanding (at page 10) the United States agrees to apply the injury test "[w]ith respect to all United States countervailing duty *investigations* in progress concerning products of Mexico as of the date of entry into force of this Understanding ... [emphasis added]." The term "investigation" is defined in section 355.6(b) of Import Administration's Countervailing Duty Regulations (19 CFR 355.6(b)) as the stage of a CVD proceeding *prior* to issuance of a CVD order. Thus, by the Understanding's own terms, it does not cover proceedings in which a CVD order has been published before April 23, 1985.

Since the Understanding constitutes the international obligation between Mexico and the United States and it specifies when the United States' obligation to grant the injury test begins, it would be contrary to the Understanding to argue the United States should grant an injury test for products which are no longer in the investigation stage. In light of the express limitation, the MFN argument is irrelevant.

Mexican government officials were told throughout the negotiations that DOC would not grant an injury test in cases in which orders had already been issued.

\* \* \* \* \* \*

I have confirmed that Mike Hathaway, Deputy General Counsel at USTR, agrees with my interpretation. (I drafted Article 5 and Mike was the principal USG negotiator).

A.R. Document No. 3 at 1–2.

Defendant also cites a memorandum dated March 13, 1986, by the Associate General Counsel of the Office of the United States Trade Representative's office (prior to March 13, 1986, the author was the Director of the ITA's Office of Policy), reconfirming his prior statement found in the October 4, 1985 memorandum. *See* A.R. Document No. 16. The Court observes these submissions by defendant lend some persuasive weight to defendant's argument.

While the Court recognizes "[a]lthough not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight," *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 184–185, 102 S.Ct. 2374, 2379–80, 72 L.Ed.2d 765 (1982), ITA regulations provide more persuasive support for the defendant's argument.

The definition of "investigations" found in these regulations provides that "[a]n 'investigation' refers to that time between the publication of a notice of initiation and the publication of the earliest of (1) a notice of termination, [sic] (2) a negative determination that has the effect of terminating the administrative proceedings; or (3) an Order." 19 C.F.R. § 355.6(b) (1985). A "determination" is defined as "an official decision in the course of a proceeding." 19 C.F.R. § 355.6(c) (1985). An "order" is further defined as "a notice issued following final determinations of subsidy and, when applicable, injury, which provides for the imposition of countervailing duties." 19 C.F.R. § 355.6(c) (1985). These definitions were published in the Code of Federal Regulations (Code) as of the time of negotiation and signing of the Understanding and existed in the Code verbatim for many years prior to that time. They, therefore, provided the background against which the Understanding between the United States and Mexico was negotiated.

Section 355.0 of Title 19 of the Code sets forth important preliminary information in regard to the scope and implementation of Part 355 dealing with countervailing duties:

§ 355.0 Scope. This part sets forth procedures and rules applicable to proceedings under section 303 and Title VII of the Tariff Act of 1930, as amended (19 U.S.C. 1303 *et seq.*) (hereinafter referred to as "the Act") relating to the imposition of countervailing duties.

19 C.F.R. § 355.0 (1985).

It is clear the Code, in setting forth procedures for imposing countervailing duties, provides that under section 303 and Title VII, the word "investigation" is limited to that period of time in a countervailing

duty investigation which precedes the issuance of a countervailing duty order. For the purposes of the instant action, the Court therefore holds "investigations in progress" does not include the 751 reviews as plaintiff has argued. The Court further holds it was neither contrary to law nor unsubstantiated by evidence on the record, in light of the above analysis, for the ITA to determine it was not precluded from imposing countervailing duties upon the Mexican PHC entered in 1984 without an injury determination, prior to the signing of the Understanding. It was neither contrary to law nor unsubstantiated by evidence on the record for the ITA to determine it lacked authority to revoke the CVD order, on account of the Understanding, since the CVD order covered those goods entered during the 1984 751 review period—a period of time prior to the effective date of the Understanding.

The language of the Understanding also sheds light on the issues at hand and lends further persuasive support for denying plaintiff's assertion the Understanding affects the CVD order and entries of PHC before April 23, 1985. The opening clause of paragraph 5 of the Understanding concerning the injury test requirement provides: "[f]or the purposes of the *application* of countervailing measures." Paragraph 6 of the Understanding further provides, in pertinent part, as follows:

> 6. *DOMESTIC PROCEDURES AND LAW*
>
> *No provision of this Understanding shall be construed to prevent the United States from finally imposing countervailing duties pursuant to its national law* on products of Mexico receiving subsidies of any kind. . . .

*Understanding* at ¶ 6 (emphasis added).

The language of the Understanding directs the imposition of countervailing duties in accordance with United States national law. Therefore, despite plaintiff's argument that the plain reading of the Understanding supports its position, the Court observes United States countervailing duty law is the source of direction and guidance in this matter.

The intent of the countervailing duty law is to impose duties on goods as they enter the United States and not to impose countervailing duties on a retroactive basis. *Cementos Guadalajara,* ——————, 686 F.Supp. at 351–52. Although the court in *Cementos Guadalajara* dealt with the ITA's challenged implementation of the countervailing duty law pursuant to 19 U.S.C. § 1303 under a similar fact pattern, the Court finds the analysis to have analogous application to the present situation dealing with the implementation of 19 U.S. C. § 1671. Here, as in *Cementos Guadalajara,* plaintiff challenges the imposition of countervailing duties without an affirmative injury determination on Mexican goods entered prior to the establishment of Mexico's status as "a country under the Agreement." Here, as in *Cementos Guadalajara,* the Court finds the actions of the ITA were supported by substantial evidence and otherwise in accordance with law when the ITA imposed countervailing duties and maintained the CVD order on PHC entered prior to Mexico's attaining "country under the Agreement" status. The ITA's decision not to revoke the CVD order, as it pertained to the review period in the second 751 review, was equally supported by the record and otherwise in accordance with law.

Plaintiff additionally claims "international obligations" of the United States require the ITC to undertake an injury investigation before countervailing duties can be imposed on the duty-free PHC from Mexico. Specifically, plaintiff charges that notwithstanding Mexico's status granted by the Understanding, Mexico's accession to the GATT in 1986 established an international obligation of the United States to provide an injury test on PHC from Mexico before countervailing duties could be imposed. Plaintiff contends: (1) the ITA's refusal to apply the GATT accession to the 1984 entries of PHC administratively reviewed during 1986; (2) the ITA's postponement of definitively making this decision; and (3) the ITA's refusal to state a basis for the above considerations, constitute reversible error.

Citing the Understanding at paragraph 8, plaintiff urges the Understanding grants Mexico a "most favored nation" status which requires the United States to extend to Mexican products treatment "no less favorable than that accorded to the products of other countries."

Plaintiff alludes to those occasions when the ITA revoked CVD orders on merchandise where the status of the goods changed after a CVD order was issued, but during a 751 review. In these cases, urges plaintiff, where there was no provision in the law for an injury determination at that point in the proceedings and the status change necessitated an injury determination before imposition of countervailing duties, the ITA revoked the CVD orders. *See, e.g., Carbon Steel Wire Rod From Trinidad and Tobago; Intention to Review and Preliminary Results of Changed Circumstances; Administrative Review and Tentative Determination to Revoke Countervailing Duty Order,* 50 Fed.Reg. 19561 (1985); and *Certain Fasteners From India; Final Results of Administrative Review and Partial Revocation of Countervailing Duty Order,* 47 Fed.Reg. 44129 (1982).

Finally, plaintiff maintains the ITA improperly failed to conduct a "changed circumstance" review pursuant to 19 U.S.C. § 1675(b). Plaintiff requested the review on October 29, 1986, more than one month prior to the publication of the final results of the second 751 review. Plaintiff claims Mexico's status change to a "country under the Agreement" was a "changed circumstance" and would have led the ITA to find the PHC was subject to an injury test and the ITA lacked authority to impose countervailing duties on the PHC without this test. Plaintiff believes the ITA had authority to conduct a "changed circumstance" review at the time of the second 751 review and publish this determination concurrently with the second 751 review results. Plaintiff charges the ITA even failed to respond to their request for review based on changed circumstances in the second 751 review results.

Defendant contends there were no "international obligations" between the United States and Mexico at the time of the issuance of the CVD order on PHC up to and including 1984 which would have required an injury test by the ITC before the ITA could impose countervailing duties on the PHC. Defendant contends there were no international obligations despite any "most favored nation" treatment allegedly accorded Mexican goods.

Defendant contends the countervailing duty law does not provide for a retroactive application of, or a request for, an injury determination for goods entered prior to the attainment of "country under the Agreement" status. Because the merchandise at issue was entered before Mexico became a "country under the Agreement," defendant asserts the ITA's determination not to specifically conduct a separate "changed circumstances" review was proper.

The Court is not persuaded the Understanding required the ITA to grant an injury determination or revoke the CVD order on the PHC entered in 1984 before countervailing duties were imposed. Based on the analysis and reasoning set forth above, regarding Mexico's status as a "country under the Agreement" pursuant to the Understanding, and upon the analysis and reasoning in *Cementos Guadalajara,* the Court holds an affirmative injury determination was not required before the ITA could impose countervailing duties on PHC entered in 1984. The ITA's imposition of countervailing duties without an injury determination on the PHC entered in 1984, prior to the effective date of the Understanding, was supported by substantial evidence and was otherwise in accordance with law. At ——, 686 F.Supp. at 352.

Concerning plaintiff's "most favored nation" argument, the Court has held the Understanding does not provide retroactive application of the U.S. countervailing duty law to goods entered prior to the effective date of the Understanding. The PHC was entered in 1984, prior to the signing of the Understanding and prior to Mexico's attainment of "most favored nation" treatment for its goods.

The ITA determinations cited by plaintiff do not support plaintiff's arguments. These determinations involved cases where dutiable goods from a GATT member country were subject to a pre-existing CVD order. During the 751 reviews, the goods were given recognition by the United States as having changed to a duty-free status. In *Fasteners From India*, the ITA determined the goods, as newly established duty-free goods, were entitled to the injury determination for goods entered *after* the status change. Because there was no authority in the statutes for the ITA to require an injury determination once a CVD order was issued and 751 reviews were proceeding, the ITA revoked the CVD order *as it pertained to those goods entered after the status change.*[18]

The two determinations, cited by plaintiff, would appear to support defendant's position to a greater extent than that of plaintiff. *See Cementos Guadalajara,* at ————, 686 F.Supp. at 351–52. In these determinations, the ITA decided to revoke the CVD orders *only* insofar as they pertained to goods entered *after* the date of the status change, and not retroactively to goods entered *before* the change.

Insofar as plaintiff's "changed circumstances" argument is concerned, the Court holds the ITA's determination concerning the 1984 PHC entries that predated the effective date of the Understanding and predated Mexico's accession to the GATT was supported by substantial evidence on the record and not contrary to law.

The applicable statute governing a request for a review due to "changed circumstances" is 19 U.S.C. § 1675(b)(1). This section provides as follows:

(b) Reviews upon information or request.—

(1) In general.—Whenever the administering authority ... receives information concerning, or a request for the review of, an agreement accepted under section 1671c of this title ... or section 1673c of this title ... or an affirmative determination made under section 1671c(h)(2), 1671d(a), 1671d(b), 1673c(h)(2), 1673d(a), 1673d(b), 1676a(a)(1), or 1676a(a)(2) of this title, which shows changed circumstances sufficient to warrant a review of such determination, it shall conduct such a review after publishing notice of the review in the Federal Register.

19 U.S.C. § 1675(b)(1) (1986).

Plaintiff alleges the ITA improperly failed to conduct a review pursuant to its request that the ITA revoke the CVD order due to "changed circumstances." Plaintiff's argument, however, is not persuasive. The ITA indicated it was "currently considering" whether the accession by Mexico to the GATT would affect future entries. Whether or not future entries will constitute sufficient grounds to satisfy the "changed circumstances" requirement will have to await the ITA's decision in the future. The ITA, as noted above, explicitly determined not to give retroactive effect to entries that predated the Understanding or Mexico's accession to the GATT.

The Court therefore holds the conclusion by the ITA that it lacked authority based upon the Understanding to revoke the CVD order as it pertained to the 1984 PHC and the ITA's conclusion that the Understanding excluded CVD orders existing prior to April 23, 1985, the effective date of the Understanding, are supported by substantial evidence on the record and are otherwise in accordance with law. The Understanding did not provide for the retroactive application of an injury determination prior to the effective date of the Understanding.

The Court further holds the determination by the ITA not to treat the PHC entered in 1984 as effectively retroactive on account of the accession of Mexico to the GATT on August 24, 1986 was supported by substantial evidence on the record and was otherwise in accordance with law. There is no provision in the U.S. domestic countervailing duty law or in the GATT

---

**18.** In the *Carbon Steel Wire* determination, the ITA has recognized the problem involved with the dutiable/duty-free change and issued a pre-liminary determination to revoke the order but has yet to issue a final revocation order.

providing for retroactive effect. *See Cementos Guadalajara,* — CIT ——, 686 F.Supp. 335.

Plaintiff also challenges the ITA's methodology in computing the value of the benefits plaintiff received from the FOMEX loans.[19] Plaintiff contends the ITA failed to compare the proper dollar benchmark with the ITA determined preferential interest rate received by plaintiff for loans under FOMEX. Plaintiff charges the ITA inappropriately used a Federal Reserve Board weighted-average interest rate to establish a national average benchmark rate and not a company-specific one as a benchmark in calculating the benefit. Plaintiff believes the proper choice as a benchmark should have been the published Mexican interbank rate (aceptaciones bancarias). In addition, plaintiff maintains the ITA improperly calculated the preferential rate on FOMEX export loans.

Defendant contends plaintiff's proposed rates were interbank rates for dollar loans and not average commercial lending rates. Defendant urges the ITA customarily uses a national average commercial benchmark as a model for comparison. According to the defendant, the ITA purposely sought a national average benchmark rate. 51 Fed. Reg. at 44501–02. Defendant maintains plaintiff's suggested rate alternatives for comparison were not considered by the ITA because they were not national average benchmark rates. Defendant further points out the ITA's policy of administering a national average commercial benchmark for the FOMEX loans was affirmed by the Court in *Alhambra Foundry v. United States,* 9 CIT 632, 635, 626 F.Supp. 402, 407 (1985).

Defendant agrees there may be some situations in which loans may vary from company to company, but here the potential variance of loans distributed among the

companies was not of a sufficient enough magnitude to resort to a use of a company-specific commercial rate by the ITA. There was no indication, defendant continues, that plaintiff's alternatively suggested rates had included finance charges which thereby would constitute effective rates for the ITA to use.

■ It appears the ITA acted reasonably and in accordance with law in choosing comparison models for benchmark rates and in calculating that rate from the information gleaned from the Federal Reserve Board. It has been held where:

> the Court is confronted with two opposing, but substantial views of the record, it is not the ambit of the Court to choose the view which it would have chosen in a trial *de novo.* Rather, the Court must sustain the administering agency's view if it is supported by substantial evidence on the record and in accordance with law.

*Hercules, Inc. v. United States,* — CIT ——, ——, 673 F.Supp. 454, 479 (1987). Plaintiff has raised some interesting points, but has not specifically pointed out in the record any information to substantiate its claim. Plaintiff has failed to show the ITA's determination regarding the FOMEX preferential rate was unreasonable or unlawful. Deference must be given to the agency's interpretation of the evidence on the record. Indeed, "[a]s long as the interpretation is sufficiently reasonable, it will be sustained. Furthermore, it need not be the only reasonable interpretation." *Id.* at 485–86 (referring to *Atcor, Inc. v. United States,* — CIT ——, ——, 658 F.Supp. 295, 299 (1987)). The Court therefore sustains the ITA's calculated value of the benefits received from the FOMEX loans as supported by substantial evidence and as otherwise in accordance with law.

**19.** The FOMEX loans originated from a trust by the same name. The trust was:

> established by the government of Mexico to promote the manufacture and sale of exported products. During the period for which we are measuring benefits, the fund was administered by the Mexican Treasury Department with the Bank of Mexico acting as the trustee. *Final Affirmative Countervailing Duty Determination and Countervailing Duty Order; Portland*

*Hydraulic Cement and Cement Clinker From Mexico,* 48 Fed.Reg. 43063, 43065 (1983). FOMEX is a program that provided short-term loans to Mexican exporters, including plaintiff, at preferential rates of interest. The FOMEX loans consist of two different programs: pre-export loans, denominated in Mexican pesos for providing manufacturers with working capital; and export loans, denominated in dollars and requiring pre-paid preferential interest.

Plaintiff's last challenge to the final results of the second 751 review concerns the ITA's use of a country-wide subsidy rate in the 751 review results rather than a company-specific assessment rate as calculated in the original final determination and CVD order. Plaintiff claims the ITA determined, in the affirmative final determination of the original CVD investigation, that the company-specific calculation rates were appropriate because the benefits received by the different Mexican companies under investigation were "materially different." 48 Fed.Reg. at 43068. For the subsequent first and second 751 reviews, plaintiff contends the ITA inconsistently applied a country-wide rate.

Plaintiff urges the applicability of 19 C.F.R. § 355.33(f),[20] which existed at the time the challenged proceedings were conducted. Plaintiff refers to the language of § 353.33(f) which provides: "such differences *shall* be estimated and stated." Plaintiff expresses additional concerns regarding the agency's exercise of discretion in its choice of methodology.

Defendant concedes the ITA altered its methodology from a company-specific subsidy calculation in the original determination to a country-wide subsidy calculation in the first and second 751 reviews. Defendant contends, however, the applicable law and the facts of the case warranted such a change. *See Portland Hydraulic Cement and Cement Clinker From Mexico; Final Results of Administrative Review of Countervailing Duty Order,* 50 Fed.Reg. 51732, 51733–34 (1985); *Portland Hydraulic Cement and Cement Clinker From Mexico; Final Results of Countervailing Duty Administrative Review,* 51 Fed.Reg. 44500, 44502 (1986).

The applicable law pertaining to this issue is set forth at § 706 of the Trade and Tariff Act of 1984, 19 U.S.C. § 1671e(a)(2). Section 1671e(a)(2) provides as follows:

§ 1671e. Assessment of duty

(a) Publication of countervailing duty order—Within 7 days after being notified by the Commission of an affirmative determination under section 1671d(b) of this title, the administering authority shall publish a countervailing duty order which—

\* \* \* \* \* \*

(2) shall presumptively apply to all merchandise of such class or kind exported from the country investigated, except that if—

(A) the administering authority determines there is a significant differential between companies receiving subsidy benefits, or \

(B) a State-owned enterprise is involved,

the order *may provide for differing countervailing duties....*

19 U.S.C. § 1671e(a)(2) (1985) (emphasis added). It is clear, from the language of this provision, Congress has authorized the agency to exercise its discretion in providing for differing countervailing duties *if* the agency determines there is a significant differential between companies receiving subsidy benefits.

■ The record is clear from the final results of both the first and second 751 reviews the ITA determined there was no significant differential between the companies receiving the subsidy benefits. Having set forth this basis for its decision, *see* 50 Fed.Reg. at 51733–34, the ITA properly exercised its statutory discretion by not providing for significant differences in the countervailing duties for the separate companies.

Although defendant alludes to the additional administrative burden as well as the rise in the number of companies (from 5 to 8) as additional support for its decision not to apply a company-specific calculation rate, it appears from the language of the

---

**20.** Section 355.33(f) sets forth:

(f) *Contents of Final Determinations.* The Final Determination shall include conclusions with regard to all facts and issues of law considered material to the Determination. If the Determination is affirmative, the amount of the net subsidy shall be estimated and stated, and the nature of the subsidy determined. If separate enterprises have received materially different benefits, such differences shall be estimated and stated.
19 C.F.R. § 355.33(f) (1983).

**1216**

published final results and in the defendant's brief before the Court the ITA did in fact calculate the values for each specific company and made this data available for use. Nevertheless, the statute is clear the ITA *may* provide for differences *if* it determines there is a significant differential between the companies receiving the subsidy benefits. The ITA has therefore complied with the statutory mandate and has not reached a determination that is contrary to law. *See Ceramica Regiomontana, S.A. v. United States,* — CIT —, —, 636 F.Supp. 961, 968 (1986), *aff'd,* 810 F.2d 1137 (Fed.Cir.1987).

Plaintiff has not provided any evidence in the record which supports its argument that the ITA's calculations were unsupported by substantial evidence or contrary to law. Furthermore, plaintiff's reliance on *Philipp Brothers, Inc. v. United States,* — CIT —, 630 F.Supp. 1317 (1986), is misplaced. *Phillip Brothers* held, *inter alia,* that the ITA must *indicate* its *justification* for its change from a company-specific basis in a CVD order to an average assessment in the 751 reviews. The court, in *Phillip Brothers,* was concerned with the failure of the agency to articulate its reasons for the decision. *Id.* at 1322–23.

The ITA has thoroughly articulated its reasons for the change in calculation methodology, thus rendering the *Phillip Brothers* rationale inapplicable to the instant action. The ITA's decision to alter the methodology for calculating the rates was not contrary to law and was supported by substantial evidence on the record.

## CONCLUSION

The Court has found, in accordance with the ITA's determination at 51 Fed.Reg. 44500 (1986), the entries of PHC subject to the second 751 review were not affected by Mexico's accession to the GATT since those goods were entered prior to accession. There is no provision in United States domestic countervailing duty law or in the GATT providing for retroactive effect. Therefore, the ITA acted in accordance with law and its determination was supported by substantial evidence in the record when it refused to revoke the CVD order

as it applied to those goods covered in the second 751 review and assess countervailing duties on the PHC. By analogy to the Court's opinion, *Cementos Guadalajara,* — CIT —, 686 F.Supp. 335, it was in accordance with law and was supported by substantial evidence in the record for the ITA to determine it lacked authority to revoke the CVD order due to the Understanding as it applied to goods covered by the same second 751 review.

The Court's holding, insofar as Mexico's accession to the GATT is concerned, does not apply to those goods subject to later 751 reviews and entered after 1984. The ITA will presumably decide subsequent to the decision in this case what will be the effect of GATT accession upon those entries. Thereafter, court challenges may be made as to those goods subject to countervailing duties assessed under further successive 751 review results.

Based upon the discussion and legal reasoning set forth above, the Court denies plaintiff's motion, sustains the ITA's administrative review results challenged here and published at 51 Fed.Reg. 44500 (1986), and enters judgment in favor of defendant.

The Court's order will be entered accordingly.

## JUDGMENT

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein, now, in conformity with said decision, it is hereby

ORDERED, ADJUDGED and DECREED that plaintiff's motion for summary judgment is denied and judgment is hereby entered for defendant; and it is

ORDERED, ADJUDGED and DECREED that the determination of the International Trade Administration is hereby sustained; and it is further

ORDERED, ADJUDGED and DECREED that this action is hereby dismissed.